Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>V.<br><br>ZULIS PIÑERO HERRERA<br><br>Apelante | KLAN202200547<br><br>*Consolidado con el*<br><br>KLCE202200816 | *Certiorari*<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Sobre: Art. 190 CP y Art. 5.04 Ley de Armas<br><br>Casos Núm.: ISCR201901231 ISCR201901232 |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Jueza Rivera Pérez y la Juez Lebrón Nieves[1].

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de octubre de 2023.

El 11 de julio de 2022, la Sra. Zulis G. Piñero Herrera (señora Piñero Herrera, acusada, convicta o apelante) nos presenta una *Apelación Criminal,*[2] para que revoquemos el veredicto unánime de culpabilidad que emitió un Jurado el 1 de abril de 2022, por la comisión del delito de robo agravado y violación al Artículo 5.04 de la Ley de Armas bajo la Ley 404 – 2000.[3] Por lo que el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI) la sentenció a cumplir un total de 23 años y 9 meses de cárcel.[4]

De otro lado, el 22 de julio de 2022 la Oficina del Procurador General de Puerto Rico (Procurador General) instó una de *Petición de Certiorari,*[5] para que revisemos la *Resolución* emitida el 17 de

---

[1] Conforme a la orden OATA-2023-040, la Hon. Gloria Lebrón Nieves fue designada en sustitución de la Hon. Gina Méndez Miró, quién desde el 24 de febrero de 2023, dejó de ejercer funciones como juez del Tribunal de Apelaciones.
[2] KLAN202200547.
[3] En este caso aplica la Ley 404 – 2000 conocida como la *Ley de Armas de Puerto Rico* 2000, vigente al momento de los hechos.
[4] El TPI sentenció a la señora Piñero Herrera a 18 años y 9 meses por violación al Artículo 190(e) del Código Penal de Puerto Rico 2012 y 5 años por violación al Artículo 5.04 de la Ley 404 – 2000.
[5] KLCE202200816.

Número Identificador

SEN2023_____

junio de 2022,[6] en la que el TPI denegó reconsiderar una solicitud de imposición de reincidencia en las sentencias impuestas.

En virtud de la estrecha relación entre los recursos *KLAN202200547 y KLCE202200816*, el 12 de octubre de 2022 emitimos una *Resolución* mediante la cual ordenamos la consolidación de ambos recursos. De igual modo, ordenamos que se elevaran los autos originales de este caso y así fue cumplido por la Secretaría del TPI de Mayagüez.

Tras atender los planteamientos según detallamos a continuación, expedimos el auto de *certiorari* para modificar las sentencias impuestas, y así, confirmamos las Sentencias apeladas.

**-I-**

Surge de los autos ante nuestra consideración que los hechos delictivos del presente caso ocurrieron el **14 de junio de 2019** en el restaurante de comida rápida *Kentucky Fried Chicken* (KFC), ubicado en la ciudad de Mayagüez. Por estos hechos, el Ministerio Público (MP) presentó cargos contra el Sr. Christian Jordán Placeres y la señora Zulis Piñero Herrera. Respecto a la apelante, el MP presentó ocho (8) denuncias, que incluían los siguientes cargos:

- **Una violación** al Artículo 190 (e) del Código Penal de Puerto Rico.[7]
- **Una violación** al Artículo 5.04 de la Ley 404 – 2000.[8]
- **Seis violaciones** al Artículo 5.15 de la Ley 404 – 2000.[9]

Luego de varios trámites procesales, el **19 de diciembre de 2019**, el TPI celebró una *Vista Preliminar en Alzada,*[10] en la que determinó causa probable para acusar a la señora Piñero Herrera por **todos** los cargos antes esbozados. Así, el MP alegó bajo juramento reincidencia simple en cada uno de los pliegos de

---

[6] Notificada el 22 de junio de 2022.
[7] Ley Núm. 146 – 2012, según enmendada conocido como el *Código Penal de Puerto Rico de 2012,* 33 LPRA sec. 5260.
[8] Ley 404 – 2000 conocida como la *Ley de Armas de Puerto Rico,* 25 LPRA ant. sec. 458c.
[9] 25 LPRA ant. sec. 458n. Véase, el Anejo I de la *Petición de Certiorari,* págs.1 –16.
[10] Anejo II de la *Petición de Certiorari,* págs.17 – 18.

acusación.[11] Consecuentemente, el **30 de diciembre de 2019** y el **3 de enero de 2020** se celebraron los actos de lectura de las acusaciones.

Luego de varias incidencias procesales, el **15 de febrero de 2022** el MP ordenó el archivo y sobreseimiento de los seis (6) cargos por infracción al Artículo 5.15 de la Ley de Armas, *supra*.[12] Por lo cual, el **14 de febrero de 2022** se presentó una acusación por infringir el Artículo 190 inciso (e) del Código Penal, *supra*,[13] y otra acusación, por violación al Artículo 5.04 de la Ley de Armas, *supra*.[14] En las acusaciones antes dichas, el MP no incluyó la alegación de reincidencia simple, en virtud la Regla 68 de Procedimiento Criminal,[15] ya que la señora Piñero Herrera aceptó la reincidencia,[16] y no fue presentada por el Jurado.

El juicio por jurado se celebró del **28 de marzo de 2022** al **1 de abril de 2022**.[17] Surge de la Transcripción de la Prueba Oral (TPO) que, los testimonios presentados por el MP, en síntesis, fueron:

- El **Agente Edwin García Lugo –** Agente de la Policía de Puerto Rico (PPR) específicamente de la Unidad de Servicios Técnicos de Mayagüez. En lo pertinente a esta controversia, testificó sobre las fotografías que tomó en el KFC el día 25 de julio de 2019.[18]
  El agente brindó testimonio sobre el *line up*, específicamente sobre cómo se obtuvieron las fotografías.

---

[11] Según alegó el MP, se procedió conforme a la Regla 48 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 48, ya que la señora Piñero Herrera tenía en su expediente el Caso Crim. *DFJ2017G0007* (resuelto el 5 de abril de 2017) del cual cumplía una sentencia suspendida de 6 años. Véase, el Anejo III de la *Petición de Certiorari*, págs.19 – 26.
[12] El MP alegó que fue a tenor a la Regla 247(a) de Procedimiento Criminal, 34 LPRA Ap. II, R. 247(a). Véase, el Anejo VI de la *Petición de Certiorari*, págs. 27 – 32.
[13] Anejo VII, págs. 33 – 32.
[14] Anejo VIII, págs. 35 – 36.
[15] En lo pertinente, dispone lo siguiente:
    *Cuando la acusación imputare un delito en algún grado de reincidencia, el acusado podrá al momento de hacer alegación, o en cualquier ocasión posterior siempre que fuere antes de leerse la acusación al jurado, admitir la convicción o convicciones anteriores y, en tal caso, no se hará saber al jurado en forma alguna la existencia de dicha convicción o convicciones.* 34 LPRA Ap. II, R. 68.
[16] La señora Zulis Piñero Herrera laboraba como Oficial Correccional en el Departamento de Corrección y Rehabilitación (DCR) y fue expulsada al ser convicta en 2017 por encubrimiento, por lo que se encontraba disfrutando de una sentencia suspendida de seis (6) años cuando cometió los delitos antes indicados.
[17] *Véase, Proyecto de Transcripción de Prueba Oral* (TPO).
[18] TPO, día 28 de marzo de 2021, págs. 40 – 72.

Además, expresó, que el Agente Mártir fue quien escogió las 9 fotografías para el *line up*, y señaló, que la fotografía de la sospechosa se encontraba *"[e]n la primera fila, la tercera, de izquierda a derecha, de frente"*.[19]

- La **Sra. Eneida Santana Quiñones -** Empleada de KFC. Testificó sobre los hechos, ya que estaba de turno esa noche. Según declaró, fue la única que observó a los coautores y luego los identificó por medio de un *line up* de fotografías.[20]

*[…]*

*P: O sea, ¿cuántas labores usted iba a realizar allí? ¿Usted fue de cajera?*

*R: De cajera, de limpieza y ayudar a mi compañera. O sea, de todo. Se hace ahí de todo.*

*P: Antes de hacerle preguntas adicionales al respecto de lo que pasó esa noche, ¿usted me puede, por favor, le puede describir al jurado cómo es ese local? ¿Cómo es el interior del Kentucky Fried Chicken allí, comenzando la Post, al lado de la Cervecería y frente al Colegio de Mayagüez? ¿Cómo es el interior?*

*R: Pues tiene la puerta principal que da.. la frente... que queda frente a frente al Colegio, y tiene una puerta lateral que es para zona del servi-auto, que es la que colinda con la Cervecería India.*

*P: Okey. Y el salón, adentro, ¿cómo es el salón, adentro?*

***R: Es amplio, visible, claro****.*

*P: Okey. El área de la cocina, ¿cómo es?*

*R: La cocina es abierta. Si yo, como cliente, estoy al frente pidiendo en el counter veo a las personas de atrás...*

*P: ¿Es una cocina abierta?*

*R: Sí, es abierta.*

*P: ¿Hay plena visibilidad allí?*

*R: Sí, sí.[21]*

*[…]*

*P: […] Dígame, a eso de las 8:45 de la noche, aproximadamente, ¿qué usted se encontraba haciendo allí, en Kentucky?*

*R: Yo estaba limpiando los cristales de esa área, la que... el área que se ve ahí la Cervecería, del área de servi-auto.[22]*

*[…]*

*P: Okey. Dígale al jurado qué pasó, mientras usted se encontraba limpiando esos cristales que están ahí.*

*R: Yo estaba limpiando ese cristal. Como yo soy la que estoy al frente, pendiente al cliente que entra al frente, pues estaba todo el tiempo observando. Entonces, cuando estaba limpiando ese cristal veo un carro que llega, deja una dama. Pues yo sigo limpiando el cristal, pendiente, a ver si va a entrar o no va a entrar. Pues el carro entró, se paró, dejó a la dama, ella entró...*

*P: Deténgase ahí y perdone que la interrumpa. ¿Cómo era ese carro que llegó?*

*R: **Era blanco. Tenía los aros grandes, color plata***.[23]

*[…]*

*P: ¿Y dónde se ubicó ese vehículo?*

*R: **Frente a frente a mí***. *O sea, él se paró. Yo estaba limpiando el cristal y él frente a frente a mí, ahí, se bajó la dama.*

*P: ¿En qué posición le quedaba ese carro a usted? Usted estaba limpiando los cristales. ¿En qué posición estaba ese vehículo, en relación a su persona?*

*R: Al frente. Frente.*

*P: ¿De frente?*

*R: Sí.*

*P: Okey. ¿Y usted dice que se bajó una dama?*

---

[19] TPO, pág. 63

[20] TPO, día 28 de marzo de 2021, págs. 90 – 147, interrogatorio directo; día 29 de marzo de 2021, págs. 5 – 142, contrainterrogatorio.

[21] TPO, día 28 de marzo de 2021, págs. 95 – 96.

[22] TPO, pág. 99.

[23] TPO, pág. 100.

*R:* **Sí**.
*P: ¿De qué parte del automóvil?*
*R:* **Del pasajero**.
*P: ¿Del pasajero?*
*R: Sí.*
*P: Continúe. Explique. ¿Qué pasó?*
*R: Pues ella... **yo observo que ella va a entrar. Ella entra, se para y me mira y yo la miro, a ver si me iba a decir algo, pero como no me dijo nada siguió para el baño**.*
*P: Okey.*
*R: En el baño estuvo un ratito. Vuelve y se para en la salida del baño, en la entrada, entrada del baño. Yo sigo trepada ahí, porque me faltaba la parte de arriba. La miro a ver si me va a pedir algo pero no me habla, no me mira, no, no. Ella miró y se...*
*P: ¿A dónde estaba mirando ella?*
*R: Pues, yo... ella me miró a mí.[24]*

[…]

*P: Santana, que usted observara, ¿para dónde miraba esa dama que entró allí?*
*R: Ella me miró y ella miró hacia al lado. **O sea, cuando tú llegas, que miras a ver si hay más gente**.[25]*

[…]

*P: ¿Recuerda cuánto tiempo estuvo la persona, la dama, usando ese baño?*
*R: Fue como un minuto.*
*P: Okey.*
*R: Un minuto. Unjú.*
*P: ¿Qué uso se le dio a ese baño por parte de la dama?, si usted lo conoce.*
*R:* **Yo sé que yo sentí que ella flochó, porque el baño flochea bien duro, y sentí que flochó el baño y abrió la pluma del lavamanos, porque se siente al... donde yo estaba se sintió**.
*P: Muy bien. Una vez esta dama sale, continúe. ¿Qué hace? ¿Qué hace usted?*
*R: Pues, yo la... **como la puerta suena al abrir, ella se paró en la misma entrada y volvió y me miró, y miró, pero como no me dijo nada, salió**.*
*P: ¿Salió?*
*R: Unjú.*
*P: ¿Hacia dónde se dirigió?*
*R: Otra vez, **yo la vi que se montó en el vehículo que vino. Salió por la puerta lateral, ahí. La misma puerta que entró, ella salió y se montó con el muchacho**.[26]*

[…]

*P: ¿Por qué área del vehículo fue que se montó?*
*R:* **Del pasajero**.[27]

[…]

*P: Okey. Y estando usted afuera, ¿dónde estaba el vehículo de motor con la dama en el pasajero?*
*R: Donde mismo él la había dejado, porque él fue y viró allá atrás y se estacionó ahí mismo, a esperarla.*
*P: ¿Quién es "él"?*
*R:* **Era un muchacho**.
*P: Un muchacho?*
*P: Sí, un muchacho.*
*R: Okey. ¿Cómo usted lo sabe?*
*R:* **Porque los vi, porque pues, eran personas normales, ¿tú sabes?, y uno mirando, porque yo estaba limpiando los cristales, pues, yo miro**.

---

[24] TPO, págs. 101 – 102.
[25] TPO, día 28 de marzo de 2021, pág. 102.
[26] TPO, págs. 103 – 104.
[27] TPO, pág. 104.

*P: Oiga, Santana, dígale al jurado cómo era la iluminación en esa área que usted estaba allí limpiando. ¿Cómo es la iluminación allí?*

*R: **Eso es claro. Es clarito. La Cervecería tiene tremenda iluminación, que alumbra todo**.*

*P: Okey. ¿Qué usted observó que hacían estas dos personas dentro del vehículo?*

*R: Hablando.*

*P: Continúe. Detálleme. ¿Qué fue lo que usted observó? ¿Qué fue lo que pasó?*

*R: **Pues, ellos estaban ahí hablando. Yo limpié los cristales y eso, y ellos estaban hablando. Terminé de limpiar el cristal, pues me paré, me trepé en la otra mesa que queda más cerca de la puerta a limpiar el canto que me faltaba. Y ellos seguían hablando.**[28]*

*[…]*

*P: Y usted trepada allí, ¿dónde está el vehículo estacionado?*

*R: Al frente. Donde mismo estaba.*

*P: ¿Qué sucede, entonces?*

*R: **Se baja el muchacho que andaba con ella**.*

*P: ¿De qué lado del vehículo se baja?*

*R: Del pasajero. O sea...*

*P: ¿"El muchacho", dijo usted?*

*R: No, el muchacho del guía. **O sea, él iba guiando. El muchacho iba guiando**.*

*P: ¿Qué pasó, Eneida? Cuéntenos. No la voy a interrumpir.*

*R: Pues, el muchacho se baja. Yo lo miro porque se... **yo lo veía claro. Un muchacho normal**. Pero cuando él se bajó hay como unas escaleras y vi como... vi que se dobló, se dobló y la puerta se abrió un poco; pues, yo miré así y yo dije: "¿Sería que se cayó?", para ver. No sabía. Lo miré.*

*Cuando yo miro al muchacho, **se estaba poniendo una máscara negra y él me dice: "No me mires porque te mato"**. Y ahí, pues yo, pues prácticamente nerviosa trepada en la mesa, porque como la puerta queda tan cerca de la mesa, yo así, lo miré así.*

*Ahí me quedé y él entró.*

*P: Okey. ¿Cuál fue el gesto que usted... cuál fue el gesto que usted observó de esta persona, de ponerse una máscara negra? ¿Qué gesto es el que usted ve que hace la persona? Si puede describirle al jurado, por favor.*

*R: Pues, **él rapidito... o sea, él se la estaba poniendo así, y me dijo: "No me mires, que te mato", y él, o sea, yo lo miré. Lo tuve que mirar, porque me quedé mirándolo**.*

*P: Okey. Nárrenos, ¿qué sucedió?, por favor.*

*R: Pues, entonces él... yo estaba trepada en la mesa. Él me dice: "No me mires porque te mato", y yo, pues, los nervios al fin, uno no sabe cómo va a reaccionar, pues yo me quedé mirándolo. **Y vuelve otra vez: "No me mires porque te mato". Entonces, ahí, cuando yo no le hice caso él sacó la pistola y trató de bajarme de la mesa pero yo no podía bajarme de la mesa**. No sabía cómo bajarme de la mesa y yo le dije: "Dame un break porque no sé bajarme. Dame un break. Dame un break".*

*Entonces, yo poco a poco bajé de la mesa y los nervios me tenían bloqueada y no podía ni caminar y él me dice:*

*"Dame el dinero", y yo le digo: "Yo no tengo ningún dinero". Me dice: "Dame el dinero", Y yo: "No tengo ningún dinero"; me dice: "¿Quién tiene el dinero?", y yo: "La gerente"; "Pues, vamos A para la gerente". Pues entonces, nos fuimos para donde estaba la gerente.[29]*

*[…]*

*P: Okey. ¿Cómo era esa pistola?, si la puede describir.*

---

[28] TPO, págs. 105 – 106.
[29] TPO, día 28 de marzo de 2021, págs. 107 – 109.

*R: Sí. **Era de color plata y tenía una franja negra**. [...].*[30]

Finalmente, la señora Santana Quiñones narró que el asaltante, pistola en mano, sacó a la gerente de su oficina —que en ese momento estaba extrayéndose leche materna— amenazó a los empleados, hasta lograr obtener el dinero de las cajas registradoras.[31] Ese dinero lo guardó en una bolsa roja con letras grandes de color blancas que decían: *Pueblo*.[32] Todos los empleados estaban acostados por orden del atracador. Así, sale del restaurant por la puerta que está en dirección al Colegio de la UPR.[33]

El 29 de marzo de 2022, la vista comenzó con el contrainterrogatorio a la señora Santana Quiñones. A preguntas de la Defensa declaró que el 14 de julio de 2019 a las 8:00 p.m., se encontraba limpiando los cristales del establecimiento KFC que estaban empañados.[34] Igualmente, dijo que en ese momento era la única persona que estaba en el área del salón.[35] Además, identificó en el *Exhibit* 2 EG,[36] las cámaras de seguridad de la Cervecería India; y dijo que, había visto el video de la cámara de seguridad una sola vez.[37] En cuanto al vehículo blanco, a pregunta de la Defensa reafirmó que se veía brilloso, como lujoso, nuevo, con aros color plata.[38] Expresó que, ese vehículo se detuvo frente a la ventana, la acusada se bajó, caminó hacia la puerta lateral en donde usualmente entran los clientes a KFC,[39] siguió hasta que entró al baño sin cursar palabras con nadie;[40] luego escuchó el sonido inodoro y del lavamanos también.[41] Reiteró que la acusada sale del

---

[30] TPO, pág. 110.
[31] TPO, págs. 110 – 119. El asaltante no pudo llevar el dinero que estaba en la bóveda.
[32] TPO, pág. 120.
[33] TPO, pág. 121.
[34] TPO, día 29 de marzo de 2022, pág. 12.
[35] TPO, pág. 13.
[36] TPO, pág. 21.
[37] TPO, pág. 23.
[38] TPO, pág. 24.
[39] *Id.*
[40] TPO, pág. 25.
[41] TPO, pág. 26.

baño y se marcha de allí por la misma puerta que entró.[42] Más adelante, la testigo indica que en el *Exhbit* 2EE, muestra la ventana 1 y 2 que era el área que ella estaba limpiando;[43] en específico, señala que al entrar la acusada, ella se encontraba limpiando en el área de la ventana 1,[44] y al salir la dama, estaba limpiando el área de la ventana 2.[45]

Luego, la Defensa intenta impugnar el testimonio antes dicho de la señora Santana Quiñones. Le muestra el video de la grabación de la cámara de seguridad del momento del asalto,[46] en el cual llega el auto blanco;[47] al correr el video, la testigo afirmó que no se ve ningún celaje en las ventanas 1 y 2, ni en la puerta lateral.[48] En cuanto a la llegada de la acusada, la señora Santana Quiñones afirmó que en el video puede observarse a la dama saliendo del vehículo y camina hacia el KFC, pero, admite que en el video no se distinguen las facciones ni muchas características físicas de acusada.[49] Tampoco se puede ver si el vehículo está parado frente a la ventana 1 o 2.[50] Confirma que la señora Piñero Herrera se ve en el video caminando "sosegadamente" entrando en el establecimiento;[51] y, en ese momento, la testigo aparece limpiando en el área de la ventana 2.[52] Expresó que, se mantuvo limpiando mientras la señora Piñero Herrera camina dentro del salón para ir al baño.[53]

También, se le preguntó a la señora Santana Quiñones si estaba ubicada en la ventana 1, a lo que respondió: "no me veo ahí",

---

[42] TPO, pág. 27.
[43] TPO, pág. 30.
[44] TPO, pág. 31.
[45] *Id.*
[46] TPO, pág. 36.
[47] TPO, día 29 de marzo de 2022, págs. 36 – 37.
[48] *Id.*
[49] TPO, pág. 39.
[50] TPO, pág. 40.
[51] *Id.*
[52] TPO, págs. 40-41.
[53] TPO, pág. 42.

refiriéndose a lo mostrado en el video.[54] Se reafirmó que había declarado que el vehículo se había estacionado frente a frente a donde ella estaba limpiando, entonces, se le cuestionó: "[l]o cierto es que, aquí viéndola a usted saliendo por esta puerta, el vehículo no está en el lugar donde usted le indicó [...]?" Respondió: "[a]hí no sé".[55] De igual modo, se le volvió a cuestionar que en el video no se no ve a ninguna persona bajarse del vehículo, a lo que la testigo responde: "[n]o, ahí no se ve".[56]

En cuanto al asaltante, se le cuestionó que "no podía ver dónde se bajó ese caballero. ¿Verdad que no?" A lo que respondió: "[s]í, no, yo lo vi, yo lo vi".[57] Reafirmó que, vio al asaltante bajarse del vehículo, pero que en el video ella no se ve.[58] Señaló que, en el video, no se aprecia ningún movimiento del vehículo cuando estaba en la parte de atrás.[59] Tampoco muestra el lugar que, dijo en el examen directo, que estaba parada.[60] La Defensa le cuestionó que no podía distinguir el rostro del caballero, a lo que la testigo respondió que sí.[61] Aclaró que, no estaba mirando para el Colegio, que: "yo estaba mirando así...".[62] Añadió que "no tenía la máscara, cuando yo lo vi no tenía la máscara". "Cuando yo lo vi, que él se bajó, no tenía la máscara".[63]

En cuanto a su declaración jurada, reiteró que, cuando se le tomó la misma, declaró que la apelante entra: "va al baño y se va".[64] También, describió a la apelante en esa declaración jurada como "bajita", "trigueñita", "llenita", y "tenía una trenza".[65]

[54] TPO, pág. 46.
[55] TPO, pág. 47.
[56] TPO, pág. 56.
[57] TPO, día 29 de marzo de 2022, pág. 58.
[58] TPO, pág. 59.
[59] TPO, pág. 60.
[60] TPO, pág. 61.
[61] TPO, pág. 61.
[62] TPO, pág. 62.
[63] TPO, pág. 62.
[64] TPO, pág. 70.
[65] TPO, págs. 72 – 73.

Finalmente, declaró que no pudo ver las notas del agente Noel Mártir Arcelay (a cargo de la investigación del caso), mientras la entrevistó.[66]

- El **Sr. Gustavo Sánchez Santiago** – empleado de KFC, testificó sobre los hechos ocurridos, pero no identificó a la acusada.[67]

- La **Sra. Yesenia Martínez Castillo** – empleada de KFC al momento de ocurrir lo hechos. Declaró sobre los hechos, pero no identificó a la acusada.[68]

- La **Sra. Bárbara María Carrau Seda** – empleada de KFC al momento de la comisión del delito. Testificó sobre los hechos ocurridos ese día y describe el arma utilizada por el coacusado, pero no identificó a la acusada.[69]

- La **Sra. Catherine Quilit Lugo** – gerente de turno de KFC en la noche que ocurrieron los hechos. Declaró sobre los hechos delictivos y describió el arma, pero no identificó a la acusada.[70]

- El **Agente Jesús Morales Caro** – Agente de vigilancia preventiva e investigación de todo incidente en la zona de Mayagüez. Fue el primer agente en llegar a la escena y entrevistar a los testigos.[71]

  *[…]*
  *P: […] la información referente a que antes de que entrara el individuo llegó un carro blanco, se bajó una dama, caminó al baño, salió y se montó en ese carro del que se bajó el individuo, ¿quién se la dio? Y haga memoria, por favor. Solamente si lo sabe. Si no lo sabe, así dígalo.*
  *R: Si mal no recuerdo, Eneida. […].* [72]

- El **Agente Carlos Albertos Luego Ayala** – Agente de la división de Robo del CIC de Mayagüez. Su participación en el caso fue estar presente en el momento del *line up* de fotos que realizó el Agente Mártir con la testigo Eneida Santana.[73]

  *[…]*
  *P: ¿Qué fue lo que pasó allí?*
  *R: Ahí pude observar que el agente Mártir le mostró un line up de fotos con nueve fotos de mujeres diferentes, donde Eneida identificó inmediatamente a la número 3, quien resultó ser Zulis, la dama que está ahí sentada al lado de la Licenciada.*
  *P: Identifica a la acusada.* [74]

  *[…]*
  *R: Y luego le mostró otro line up de fotos de 10 hombres, donde también Eneida identificó a un joven de nombre Christian.*
  *P: Usted dice que eso fue inmediatamente, explique.*
  *R: Pues, inmediatamente que vi a la testigo Eneida bien segura de sí misma tan pronto Mártir le mostró las fotos, que inmediatamente señaló el número 3, que resultó ser Zulis. […].*[75]

---

[66] TPO, págs. 81 – 82.
[67] TPO, día 29 de marzo de 2021, págs. 130 – 144.
[68] TPO, día 29 de marzo de 2022, págs. 144 – 165.
[69] TPO, día 30 de marzo de 2021.
[70] TPO, págs. 33 – 56.
[71] TPO, págs. 69 – 105.
[72] TPO, pág. 73.
[73] TPO, día 30 de marzo de 2021, págs. 116 – 129.
[74] TPO, págs. 118 – 119.
[75] *Id.*

- El **Agente Noel Mártir Arcelay** – Agente de la División de Robo del CIC. Fue el agente investigador principal, y testificó sobre toda la investigación que realizó en el presente caso.[76]

*[…]*

*P: […] ¿Qué otra información comprende ese documento?*

*R: Ahí está, pues, la fecha de los hechos y las horas que me informan que fue el suceso el 14 de julio de 2019, a las 8:50 p.m. Y la dirección, Alfonso Valdés Cobián, que es la avenida.*

*P: Okey.*

*R: Y el Kentucky Fried Chicken.[77]*

*[…]*

*P: Vamos entonces un poquito más abajo, ya al narrativo. Este número que está aquí, ¿qué es?*

*R: Esa fue la cantidad que me indicó Katherine que se habían apropiado durante el robo, $523.38. Quinientos veintitrés dólares con treinta y ocho centavos.[78]*

*[…]*

*P: **¿Qué datos pudo obtener de la entrevista con la señora Eneida Santana?***

*R: Pues, en ese momento, pues, ella me explica que se encontraba, pues... ella estaba, pues, doblando turno porque había faltado una empleada, pues ella se quedó, verdad, cerrando, pues, haciendo ese turno de la empleada que había faltado. Ella estaba, pues, en ese momento en la caja registradora. Pero como no habían clientes, ya era, pues, ya eran casi las 9:00 de la noche. Ella procedió, pues, a adelantar, pues, las labores de limpieza antes, verdad, del cierre.*

*Como no hay ningún cliente, pues, ella sale afue... o sea, afuera, al área del comedor y comienza, pues, a limpiar allí entre las mesas y los cristales, y ella ve que llega un vehículo blanco. A todo esto, como ella es la que está en la caja registradora, ella piensa que es un cliente que va a comprar algo. Pues, ella se mantiene, pues, pendiente a ese vehículo a ver si, pues, si se bajan las personas en... ella, pues, continúa, pues, en su labor de limpiar.*

*Luego de esto, pues, ella me indica que se baja una fémina. Una dama se baja de ese vehículo y 18 entra al área del, verdad, del restaurante. Ella, 19 pues, se mantiene en todo momento pendiente a la dama, ¿verdad? Mirando a ver qué va a hacer la dama. Ella dice que la dama continuó hacia el baño. Ella la observa. Entra y sigue hacia el baño.*

*Ella pues, entiende, pues, déjame seguir... según las palabras de ella misma, indica: "Yo sigo trabajando, pensando, pues, que ella va a pedir después que salga del baño". Pero continuaba entonces su labor. En eso, pues, la seño... la persona, pues, la dama que sale del baño. Ella, pues, nuevamente me dice que tiene contacto visual con ella, pendiente a ver qué va a hacer la dama. Y la dama, pues, sale. Vuelve y se monta en el mismo vehículo blanco donde llegó. Y allí, pues, ella, pues, está todo el tiempo en contacto con ese vehículo blanco, pensando, "pues, será que van a pedir luego".*

*Ella ve que está en el vehículo con un caballero, que están los dos en el vehículo. Las dos personas en el vehículo. Y continúa, pues pendiente al vehículo y continúa pues, limpiando los cristales. Inclusive, en un momento dado sale afuera, a limpiar los cristales por fuera.*

*Luego que entra nuevamente, después que limpia los cristales afuera, de momento ella ve que se baja el mismo caballero que está en el vehículo con la dama hablando. Se baja del vehículo y viene en dirección hacia entrar al restaurante. Entonces, ella me indica que cuando el caballero viene, ella lo ve que viene de camino hacia donde... hacia entrar por la puerta y ella está,*

---

[76] TPO, día 31 de marzo de 2021, págs. 3 – 238.
[77] TPO, pág. 72.
[78] TPO, págs. 72 – 73.

*pues, limpiando los cristales al lado. Y cuando está llegando el caballero a la puerta, ella dice como que se baja un poco. Hace un movimiento, como que se baja, y se baja como un gorrito o un sombrerito que ya tenía, y ahí es que se baja pues, la máscara. Y con un arma de fuego entra y le apunta a Eneida y le dice: "Dame el dinero", y ahí procede. Pues, ella, pues en ese momento se pone nerviosa.*

*Ella estaba, me dice, que sobre una de las mesas y no sabía en ese momento, por el nerviosismo, cómo bajarse. Pues, le dio trabajo bajarse. Pero finalmente, pues, logra bajarse y el individuo apuntándole la lleva y le dice: "Dame el dinero", y ella le dice: "Yo no puedo darle el dinero, que es la gerente", - "Pues, llévame donde la gerente". Pues, ella... procede, verdad, a mover a Eneida hasta adentro. Cuando va... entra al área de, verdad, donde están los empleados ya adentro de... en la puerta, pues ahí, en ese momento sale otra empleada que estaba también ayudándole a Eneida, pero había entrado a buscar unos materiales de limpieza, y se tropieza con ellos. Y ahí, pues, el individuo coge a la otra muchacha también, que es Yesenia, y entran entonces los tres adentro del área de, verdad, de los... ya de la cocina y hacia... en dirección hacia la oficina. Ahí es que entonces suc... ocurre lo de la oficina que narramos anteriormente, que le tocan en la puerta a Katherine, y pues, entonces ahí, cuando Katherine finalmente abre la puerta luego de que, pues, que Eneida le insiste, pues, ahí entonces Eneida me dice que la suelta, a Eneida... o sea, deja de apuntarle, y entonces le apunta a Katherine y se va con Katherine, pues, a las cajas registradoras a, pues, a lo del... a apropiarse del dinero. En ese momento Eneida me dice que se mantiene allí. A la otra muchacha, Yesenia, pues, la tira también al piso. Y ella se mantiene de pie al lado de la oficina, pero observando, pues, todo que ocurre, verdad, cuando llegan a la caja registradora. Luego van al área del frente, adonde la bóveda y ella, pues, en todo momento escucha, Eneida, lo que está pasando, y está pendiente para lo que está pasando. Y hasta que finalmente, pues, el individuo, pues, se marcha del lugar.[79]*

*P: Durante la entrevista con la señora Eneida Santana, señor agente Mártir, le pregunto, **¿qué descripción, si alguna, la señora Santana le pudo brindar de la fémina que ella indica que entró al Kentucky Fried Chicken?***
*R: Ella me indica que es una fémina, una dama trigueña que tenía los ojos como hundidos. Esa es la descripción que ella me da en ese momento. Que tenía como ojeras, también, en los ojos. Me indica que tenía unas... en ese momento, unas trenzas, Y que vestía un set como color violeta, como de pantalón corto y blusa como con diseño de flores.[80]*

[…]

*P: **Cuando usted entrevistó a la señora Eneida Santana, ¿cuál era su estado de ánimo?***
*R: Pues estaba, pues, un poco nerviosa, ansiosa, pues, por la situación, verdad, que había pasado. En un momento de trauma... un trauma, pues, una situación difícil. **Pero siempre estaba, pues, segura, como que ella decía: "pero yo los vi".** Como que me insistía, como que ella los había visto, a las dos personas las había visto bien. Y yo le pregunté, pues, como parte de mi investigación le pregunto: "**Si tú los ves nuevamente, ¿los puedes identificar?". Eso le pregunto siempre a todos los perjudicados, verdad, de delitos de robo, y ella me decía que sí, que podría, pues, reconocerlos de verlos nuevamente en algún momento**.[…].[81]*

---

[79] TPO, día 31 de marzo de 2021, págs. 77 -81.
[80] TPO, págs. 81 – 82.
[81] TPO, pág. 84.

Además de la prueba testifical, surge del expediente que el MP presentó prueba documental y electrónica (videos).[82] Concluido el desfile de prueba el **31 de marzo de 2022**, la representación legal de la acusada solicitó en corte abierta la absolución perentoria.[83] El TPI escuchó los planteamientos, y decidió reservarse la determinación.

También, la Defensa le solicitó al TPI que en las instrucciones al Jurado, se impartiera la instrucción de *mera presencia*. Al respecto, el Juez resolvió:

> HONORABLE JUEZ:
> *[…]*
> *Les pido que por favor lo examinen. Cualquier planteamiento que tengan a bien realizar sobre el particular mañana a primera hora lo podemos atender.*
> ***Sé que estaba todavía sobre la mesa lo concerniente a la instrucción de mera presencia. Sobre ese particular específicamente, la Defensa hizo un planteamiento concerniente a la preocupación de que el jurado no supiese qué hacer al identificar si había una mera presencia en el caso. Ya el Tribunal había adelantado en cierta medida la intención de impartir solamente la instrucción 4:11 en cuanto a coautores.***
> *Tanto a las solicitudes que hizo el Ministerio Público en su momento en cuanto a unas instrucciones específicas y particulares, en cuanto a la posesión y otros aspectos, lo que hemos hecho es lo siguiente… Si pueden ir a la página… Les digo rapidito. A la página 7 donde está la instrucción de coautores, específicamente en el segundo párrafo fuimos un poco más amplios en términos de aquellas instancias donde, y voy a leer textualmente lo que allí se recoge:*
> ***"Si por el contrario no se demuestra la (ininteligible) unión de voluntades de las personas acusadas en la realización del acto, entonces la responsabilidad habrá de recaer solamente sobre quién actuó o lo realizó por sí solo, debiendo el jurado emitir en dichas instancias un veredicto de culpable en cuanto a quien cometió el delito cuando aplique, y de no culpable en cuanto se haya determinado que no lo cometió".***
> ***Se ha hecho constar oportunamente el planteamiento de la Defensa. Este Juez, en atención a la prueba que ha desfilado, en atención al análisis que hemos hecho del punto de derecho de la jurisprudencia que se ha mencionado, es la instrucción que va a estar emitiendo sobre ese particular.***

---

[82] La prueba marcada como Exhibit fue la siguiente:
    Exhibit 1: Acta sobre Confrontación (2 folios).
    Exhibit 2: (2A-2HH): Fotografías del lugar del crimen (36 fotografías).
    Exhibit 3: Acta sobre Confrontación Fotográfica (2 folios).
    Exhibit 4: Disco compacto (grabación de cámaras de seguridad del día y hora del crimen).
    Exhibit 5: Registro Electrónico de Armas (1 folio).
    Exhibit 6: Registro Negativo de Arma de Fuego (1 folio).
    Exhibit 7: Notas del Agte. Martir Arcelay.
    Exhibit 8: Informe de Incidente (5 folios).
[83] TPO, día 31 de marzo de 2022, págs. 250 – 263.

*Bien. Si aparte de lo que ya hemos discutido, como indiqué, **¿hay algún planteamiento por las partes concerniente a esas instrucciones una vez las puedan examinar hoy?**, pues, mañana a primera hora. Mi intención sería en el día de mañana comenzar a primera hora con los informes. Hay como tres o cuatro asuntos del calendario regular. Como hemos visto durante toda la semana, esos asuntos nunca están listos a las 9:00 de la mañana. Así que, para evitar la dilación de este proceso, yo prefiero comenzar con los informes. Ya estoy, como les dije, anticipando una hora para cada uno. ¿Tienen alguna objeción a ese tiempo?*

*LCDA. ANA M. STRUBBE RAMÍERZ:*

*No, Juez.  Las partes habíamos quizás... Íbamos a sugerir si podíamos nosotros comenzar a partir de las 10:00 de la mañana, precisamente por la hora en que estamos saliendo... y como vemos, y anticipo al Tribunal que vamos a renunciar al resumen de la prueba...*

HONORABLE JUEZ: *Okey.*[84]

El **1 de abril de 2022** se impartieron las instrucciones al Jurado, en específico, la instrucción 4.11 de coautores; así, se retiraron a deliberar. A su regreso, el Jurado emitió un veredicto unánime de culpabilidad contra la acusada, señora Piñero Herrera, por los delitos de robo agravado y portación ilegal de un arma de fuego.

El **13 de mayo de 2022** se celebró la vista para dictar sentencia.[85] El TPI inició la vista atendiendo los argumentos de la Defensa sobre la denegatoria a la petición de absolución perentoria emitida el 11 de mayo de 2022.[86] A pesar de los argumentos de la señora Piñero Herrera, reiteró su denegatoria.[87]

Antes de que se dictara sentencia, el MP planteó —en síntesis— que en este caso aplicaba: la reincidencia simple,[88] el agravante del Artículo 5.04 de la Ley de Armas,[89] y los agravantes

---

[84] TPO, 31 de marzo de 2022, págs. 244 – 247.
[85] Anejo X de la *Petición de Certiorari*, pág. 42, *Regrabación del 13 de mayo de 2022*. Véase además, la Minuta del 13 de mayo de 2022, a la pág. 1 que obra en los autos originales.
[86] *Regrabación*, minutos del 11:08:13 a.m. al 11:16:52 a.m.
[87] *Id.*, minutos del 11:16:31 a.m. al 11:16:52 a.m.
[88] Artículo 73 del *Código Penal de Puerto Rico* 2012, *supra*, 33 LPRA sec. 5106.
[89] Se considerará como "agravante" cualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa. 25 LPRA ant. sec. 458c.

de los incisos (b),[90] (k),[91] (o)[92] del Artículo 66 del Código Penal.[93] Añadió, que en el Informe Presentencia reveló —entre otros— que la señora Piñero Herrera se encontraba en libertad bajo palabra por seis (6) años cuando cometió estos delitos.[94] Además, la convicta negó la comisión del delito y le imputó toda la responsabilidad al coautor.

De otro lado, la acusada arguyó que, el MP perdió la oportunidad de someter los agravantes, ya que no los presentó ante el Jurado. Añadió, que los agravantes eran parte de los elementos de los delitos, por lo que no se podía considerar para fijar las penas. En cuanto a la reincidencia, indicó que el tribunal no estaba obligado a imponer el 25% de aumento de la pena, pues ese era el máximo. También, sostiene su inocencia y se propone apelar las sentencias, por lo que no reconoce la comisión de los delitos. Además, solicitó que se le aplique un atenuante por su conducta pasiva durante el robo. Relativo al Artículo 5.04 de la Ley de Armas, arguyó que la conducta de uso está ceñida al coautor, al igual que en la acusación, por lo que no se puede agravar la pena de arma de fuego.

---

[90] *(b) El convicto cometió el delito mientras disfrutaba de los beneficios de sentencia suspendida, libertad bajo palabra, restricción domiciliaria o libertad provisional bajo fianza o condicionada, o en un programa de desvío.*

[91] *(k) El convicto utilizó un arma de fuego en la comisión del delito o empleó algún instrumento, objeto, medio o método peligroso o dañino para la vida, integridad corporal o salud de la víctima.*

[92] *(o) El delito cometido fue de violencia y su comisión revela crueldad y desprecio contra la víctima.*

[93] 33 LPRA sec. 5099 (b), (k), (o).

[94] Dicha sentencia suspendida fue por infracción al delito de encubrimiento (Artículo 280 del Código Penal), mientras fungía como Oficial Correccional del DRC. El delito de encubrimiento se comete cuando:

Toda persona, que con conocimiento de la ejecución de un delito, oculte al responsable del mismo o procure la desaparición, alteración u ocultación de prueba para impedir la acción de la justicia, será sancionada con pena de reclusión por un término fijo de tres (3) años.

Si la persona convicta es una persona jurídica será sancionada con pena de multa hasta diez mil dólares ($10,000). Cuando el encubridor actúe con ánimo de lucro o se trate de un funcionario o empleado público y cometa el delito aprovechándose de su cargo o empleo, será sancionado con pena de reclusión por un término fijo de ocho (8) años. Si la persona convicta es una persona jurídica será sancionada con pena de multa hasta treinta mil dólares ($30,000). 33 LPRA sec. 5373.

El TPI respondió que examinó todos los procesos y normas para dictar sentencia e incluso el Artículo 7.03 de la Ley de Armas de Fuego, que duplica de la pena. Razón por la cual se proponía a dictar sentencia, conforme a su discreción.

Antes de dictar sentencia, la acusada hizo uso de su derecho a alocución. Ofreció disculpas por no hablar antes, ya que no tenía conocimiento de lo que el coacusado iba hacer. Manifestó que estuvo en ese momento sin saber lo que estaba sucediendo, hasta que se dio cuenta. Expresó que calló porque estaba bajo amenaza.[95]

Escuchados los argumentos de ambas partes, el TPI sentenció a la señora Piñero Herrera a cumplir una **sentencia atenuada** con un total de 23 años y 9 meses de cárcel.[96]

- *Caso Crim. Núm. ISCR201901231 por el Artículo 190 (e) del Código Penal, supra le impuso a una **pena atenuada** de **18 años y 9 meses de cárcel**.*
- *Caso Crim. ISCR201901232 por el Artículo 5.04 de la Ley de Armas le impuso una **pena atenuada de 5 años**.*[97]

Inconforme, el MP manifestó su discrepancia y expresó que, ante la reincidencia aceptada por la convicta correspondía mínimamente imponer la pena fija en ambos delitos.[98] El TPI respondió que, referente a la reincidencia el Artículo 73 (a) del Código Penal,[99] *"se podrá aumentar hasta en un 25%, es allí donde se hace la interpretación que este tribunal ha hecho"*.[100] El MP reiteró que, correspondía imponer las penas fijas de los delitos de robo agravado y de portación ilegal de armas de fuego, ya que las sentencias atenuadas no tomaban en consideración la reincidencia.

Por su parte, la Defensa expresó su conformidad con las sentencias dictadas. Finalmente, el TPI indicó que no consideró el

---

[95] Véase, la Minuta del 13 de mayo de 2022 que obra en los autos originales.
[96] Anejo X de la *Petición de Certiorari*, pág.42, *Regrabación del 13 de mayo de 2022*, minutos del 11:29:32 a.m. al 11:30:10 a.m.
[97] El TPI determinó que ambas penas se cumplirían de forma consecutiva.
[98] Anejo X de la *Petición de Certiorari*, pág.42, *Regrabación del 13 de mayo de 2022*, minutos del 11:30:20 a.m. al 11:31:26 a.m. Véase además, la Minuta del 13 de mayo de 2022, a la pág. 2 que obra en los autos originales.
[99] 33 LPRA sec. 5106 (a).
[100] Véase, además, la Minuta del 13 de mayo de 2022, a la pág. 2 que obra en los autos originales.

agravante del Artículo 7.03 de la Ley de Armas por entender que esos actos fueron ejecutados por otra persona. En ese sentido, el grado de participación de la convicta en los delitos que se le imputan, tomó en consideración el atenuante del Artículo 65 (l) del Código Penal.[101]

Así, el **23 de mayo de 2022** el TPI notificó por escrito las sentencias emitidas el 13 de mayo de 2022.[102]

El **25 de mayo de 2022**, el MP presentó una solicitud de *Reconsideración*,[103] y reiteró los planteamientos levantados en la vista de dictar sentencia. Arguyó que, aun cuando no solicitó una vista de agravantes ante el Jurado, indicó que el delito de *robo agravado* en la modalidad *uso de armas de fuego en la comisión de delito* tiene una pena fija de 25 años de cárcel. A su vez, reafirmó que el Artículo 5.04 de la Ley de Armas tiene una pena fija de 10 años. Añadió, que de los hechos probados y del Informe Presentencia, se desprenden agravantes que podrían aumentar ambas penas. Adujo que el TPI abusó de su discreción al imponer una pena atenuada sin considerar los agravantes y la reincidencia aceptada por la convicta.

En cumplimiento de orden, la señora Piñero Herrera se opuso.[104] En resumen, reiteró que el MP no solicitó una vista de agravantes ante el Jurado, por lo que estaba impedido de solicitarlo. Añadió, que la aceptación de reincidencia no obligaba al tribunal a aumentar la pena. Señaló que, en la amplia discreción que le permite el Artículo 67 del Código Penal, el TPI consideró los agravantes y atenuantes y resultó en una pena atenuada del robo agravado. Así, el Artículo 5.04 de la Ley de Armas, el tribunal consideró que la acusada no tuvo participación en el uso del arma

---

[101] *La participación del convicto no fue por sí sola determinante para ocasionar el daño o peligro que provocó el hecho.* 33 LPRA sec. 5098 (l).
[102] Anejo XI, Anejo XII, Anejo XIII de la *Petición de Certiorari*, págs. 43 – 46.
[103] Anejo XIV de la *Petición de Certiorari*, págs. 47 – 49.
[104] Anejo XVI de la *Petición de Certiorari*, págs. 52 – 58.

de fuego, y en su discreción, impuso una sentencia atenuada de cinco (5) años. Además, arguyó que el coacusado Christian Jordán Placeres, en un juicio separado, resultó absuelto de todos los cargos, por lo que sería un fracaso de la justicia agravar el cargo por arma de fuego. Razón por la cual, la sentencia impuesta fue correcta en derecho.

El **17 de junio de 2022**,[105] el TPI emitió una *Resolución* en la que sostuvo las sentencias dictadas.[106]

Oportunamente, la señora Piñero Herrera compareció ante nos mediante el recurso de apelación ***KLAN202200547***. Adujo que durante la celebración del juicio se cometieron los siguientes cinco (5) errores:

1. *Erró el Jurado al declarar culpable a la apelante por cuanto la prueba de cargo desfilada fue insuficiente en derecho y altamente contradictoria para establecer su culpabilidad más allá de toda duda razonable en todos y cada uno de los cargos por los cuáles se le acusó.*

2. *Erró el Jurado al declarar culpable a la apelante de modalidad de coautoría del delito de Robo Agravado y Posesión de Arma de Fuego por cuanto la prueba de cargo desfilada fue insuficiente en derecho para establecer los elementos de participación y posesión más allá de duda razonable.*

3. *Erró el Honorable Tribunal de Primera Instancia al no acceder a dar la Instrucción al Jurado en cuanto Posesión Constitutiva fundamentada y solicitada por la Defensa a pesar de haberse ofrecido una instrucción propia, pertinente y no cubierta por las demás instrucciones.*

4. *Erró el Honorable Tribunal de Primera Instancia al declarar No Ha Lugar la petición de Absolución Perentoria presentada por la defensa toda vez que la prueba desfilada ante el Jurado no era suficiente para sostener el derecho una convicción por el delito de Robo Agravados.*

5. *Erró el Honorable Tribunal de Primera Instancia al declarar No Ha Lugar la petición de Absolución Perentoria presentada por la defensa toda vez que la prueba desfilada ante el Jurado no era suficiente para sostener el derecho una convicción por el delito Posesión de Armas de Fuego.*

Igualmente, el Procurador General acude ante nos mediante *certiorari* ***KLCE202200816*** y señala que el TPI cometió el siguiente error:

---

[105] Notificada el 22 de junio de 2022.
[106] Anejo XVIII de la *Petición de Certiorari,* págs. 59 – 60.

*El Tribunal de Primera Instancia erró y abusó, crasamente, de su facultad discrecional cuando aplicó una sentencia atenuada, a pesar de que la señora Piñero Herrera aceptó la reincidencia bajo la Regla 68 de Procedimiento Criminal, supra., y no consideró ni evaluó en su determinación los agravantes traídos por el Ministerio Público.*

Luego de varios trámites procesales, la parte apelante presentó la Transcripción de la Prueba Oral y posterior Alegato Suplementario. Al respecto, el Procurador General presentó el alegato en oposición. De igual modo, la señora Piñero Herrera presentó su oposición al auto de *certiorari* solicitado por el Procurador General. Además, contamos con los autos originales, por lo que procedemos a resolver.

**-II-**

**-A-**

Constituye un principio fundamental que la culpabilidad de todo acusado de delito debe ser probada más allá de duda razonable. Este principio es consustancial con el principio de la presunción de inocencia y del debido proceso de ley, lo cual se deriva de lo consagrado en la Enmienda VI de la Constitución Federal de E.U.,[107] y del Artículo II, Sección 11 de la Constitución de Puerto Rico,[108] Así, el peso de la prueba permanece sobre el Estado durante todas las etapas del proceso a nivel de instancia.[109] En otras palabras, en nuestro sistema de justicia criminal el Ministerio Público tiene la obligación de presentar suficiente evidencia sobre todos los elementos del delito y su conexión con el acusado a fin de establecer la culpabilidad de este más allá de duda razonable.[110]

No obstante, la determinación de suficiencia de la prueba, que evidencie la culpabilidad del acusado más allá de duda razonable, es una cuestión de conciencia, producto de todos los elementos de juicio del caso y no meramente una duda especulativa o

---

[107] 1 LPRA, ed. 2023, pág. 163.
[108] 1 LPRA, ed. 2023, pág. 267.
[109] *Pueblo v. Rodríguez Pagán,* 182 DPR 239, 258 (2011).
[110] *Pueblo v. García Colón* I, 182 DPR 129, 174 (2011).

imaginaria.[111] Con el fin de explicar este concepto, el Tribunal Supremo ha expresado que:

> *[D]uda razonable es aquella duda fundada que surge como producto del raciocinio de todos los elementos de juicio involucrados en el caso. Para que se justifique la absolución de un acusado, la duda razonable debe ser el resultado de la consideración serena justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación. En resumidas cuentas, duda razonable no es otra cosa que la insatisfacción de la conciencia del juzgador con la prueba presentada.*[112]

**-B-**

El Código Penal de Puerto Rico establece que una persona comete el delito de **robo** cuando *"[s]e apropi[a] ilegalmente de bienes muebles pertenecientes a otra, sustrayéndolos de la persona en su inmediata presencia y contra su voluntad, por medio de violencia o intimidación, o inmediatamente después de cometido el hecho emplee violencia o intimidación sobre una persona para retener la cosa apropiada, será sancionada con pena de reclusión por un término fijo de quince (15) años.*[113]

Ahora, si en la comisión del delito de robo medie el uso de un arma de fuego, se configuran los elementos para ser clasificado como un **robo agravado**,[114] con una pena fija de 25 años de cárcel.[115]

Una vez probada la culpabilidad del acusado, puede haber circunstancias que agraven o disminuyan la pena.

---

[111] *Pueblo v. Irizarry*, 156 DPR 780 (2002).
[112] *Id.,* pág. 788. *(citas omitidas).*
[113] **Artículo 189. — Robo**. 33 LPRA sec. 5259.
[114] **Artículo 190. — Robo agravado**.
Será sancionada con pena de reclusión por un término fijo de veinticinco (25) años, si el delito de robo descrito en el Artículo 189 se comete en cualquiera de las siguientes circunstancias:
  (a) cuando se vale de un menor que no ha cumplido dieciocho (18) años de edad;
  (b) cuando el bien objeto del delito es un vehículo de motor;
  (c) cuando en el curso del robo se le inflige daño físico a la víctima;
  (d) cuando ocurre en un edificio ocupado donde esté la víctima o en cualquier otro lugar donde ésta tenga una expectativa razonable de intimidad;
  **(e) cuando medie el uso de un arma de fuego en la comisión del delito**;
  (f) cuando la víctima o víctimas sean amarradas, amordazadas o se limite su libertad de movimiento durante la comisión del delito. El tribunal también podrá imponer la pena de restitución. 33 LPRA sec. 5260 (e).
[115] 33 LPRA sec. 5260.

En ese sentido, se debe examinar los Artículos 65 y 66 del Código Penal,[116] que establecen las circunstancias atenuantes y agravantes a ser consideradas, respectivamente:

***Artículo 65. — Circunstancias atenuantes.**[117]*
*Se consideran circunstancias atenuantes a la pena los siguientes hechos relacionados con la persona del convicto y con la comisión del delito:*
*(a) Las causas de exclusión de responsabilidad penal cuando no concurran todos sus requisitos para eximir.*
*(b) El convicto no tiene antecedentes penales.*
*(c) El convicto observó buena conducta con anterioridad al hecho y goza de reputación satisfactoria en la comunidad.*
*(d) La temprana o avanzada edad del convicto.*
*(e) La condición mental y física del convicto.*
*(f) El convicto aceptó su responsabilidad en alguna de las etapas del proceso criminal.*
*(g) El convicto cooperó voluntariamente al esclarecimiento del delito cometido por él y por otros.*
*(h) El convicto restituyó a la víctima por el daño causado o disminuyó los efectos del daño ocasionado.*
*(i) El convicto trató de evitar el daño a la persona o a la propiedad.*
*(j) El convicto fue inducido por otros a participar en el incidente.*
*(k) El convicto realizó el hecho por causas o estímulos tan poderosos que le indujeron arrebato, obcecación u otro estado emocional similar.*
***(l) La participación del convicto no fue por sí sola determinante para ocasionar el daño o peligro que provocó el hecho.**[118]*
*(m) El daño causado a la víctima o propiedad fue mínimo.*

***Artículo 66. — Circunstancias agravantes.**[119]*
*Se consideran circunstancias agravantes a la pena los siguientes hechos relacionados con la persona del convicto y con la comisión del delito:*
***(a) El convicto tiene historial delictivo que no se consideró para imputar reincidencia**.[120]*
***(b) El convicto cometió el delito mientras disfrutaba de los beneficios de sentencia suspendida, libertad bajo palabra, restricción domiciliaria o libertad provisional bajo fianza o condicionada, o en un programa de desvío**.[121]*
*(c) El convicto mintió en el juicio que se llevó en su contra estando bajo juramento y no se le procesó por perjurio.*
*(d) El convicto amenazó a los testigos, los indujo a cometer perjurio u obstaculizó de otro modo el proceso judicial.*
*(e) El convicto se aprovechó indebidamente de la autoridad del cargo o empleo que desempeñaba, o del servicio o encomienda que tenía bajo su responsabilidad.*
*(f) El convicto cometió el delito mediante la utilización de un uniforme que lo identificaba como agente del orden público estatal, municipal o federal o como empleado de una agencia gubernamental o de entidad privada.*

---

[116] 33 LPRA sec. 5098 – 5099.
[117] 33 LPRA sec. 5098.
[118] Atenuante alegado por la acusada.
[119] 33 LPRA sec. 5099.
[120] Agravante alegado por el MP.
[121] Agravante alegado por el MP.

*(g) El convicto utilizó un menor o discapacitado para la comisión del delito.*

*(h) El convicto indujo o influyó o dirigió a los demás partícipes en el hecho delictivo.*

*(i) El convicto planificó el hecho delictivo.*

*(j) El convicto realizó el hecho delictivo a cambio de dinero o cualquier otro medio de compensación o promesa en ese sentido.*

**(k) El convicto utilizó un arma de fuego en la comisión del delito o empleó algún instrumento, objeto, medio o método peligroso o dañino para la vida, integridad corporal o salud de la víctima.[122]**

*(l) El convicto causó grave daño corporal a la víctima o empleó amenaza de causárselo.*

*(m) El convicto abusó de la superioridad física respecto a la víctima y le produjo deliberadamente un sufrimiento mayor.*

*(n) La víctima del delito era particularmente vulnerable ya sea por ser menor de edad, de edad avanzada o incapacitado mental o físico, o por ser una mujer embarazada, en cualquier etapa del período del proceso de gestación, e independientemente de si el hecho del embarazo era o no de conocimiento de la persona que cometió dicho delito al momento de cometerlo.*

**(o) El delito cometido fue de violencia y su comisión revela crueldad y desprecio contra la víctima.[123]**

*(p) El delito se cometió dentro de un edificio perteneciente al Estado Libre Asociado de Puerto Rico, dependencia pública o sus anexos u ocasionó la pérdida de propiedad o fondos públicos.*

*(q) El delito fue cometido motivado por prejuicio hacia y contra la víctima por razón de raza, color, sexo, orientación sexual, género, identidad de género, origen, origen étnico, estatus civil, nacimiento, impedimento o condición física o mental, condición social, religión, edad, ideologías políticas o creencias religiosas, o ser persona sin hogar. Para propósitos de establecer motivo como se dispone en este inciso, no será suficiente probar que el convicto posee una creencia particular, ni probar que el convicto meramente pertenece a alguna organización particular.*

*(r) Existe un vínculo de parentesco del convicto con la víctima del delito dentro del segundo grado de consanguinidad, afinidad o por adopción.*

*(s) El delito se cometió en la residencia o morada de la víctima.*

A su vez, el Artículo 67 del Código Penal,[124] establece que el Juez podrá tomar en consideración las circunstancias atenuantes y agravantes antes dispuestas para aumentar, reducir o neutralizar la pena:

*La pena será fijada de conformidad con lo dispuesto en cada Artículo de este Código.*
*Excepto en delitos cuyo término de reclusión señalado en el tipo sea de noventa y nueve (99) años, el tribunal podrá tomar en consideración la existencia de circunstancias atenuantes y agravantes dispuestas en los Artículos 65 y 66 de este Código.*

---

[122] Agravante alegado por el MP.
[123] Agravante alegado por el MP.
[124] **Artículo 67. — Fijación de la Pena**; imposición de circunstancias agravantes y atenuantes. 33 LPRA sec. 5100.

> ***En este caso, de mediar circunstancias agravantes****, <u>la pena fija establecida podrá ser aumentada hasta un veinticinco (25) por ciento</u>; **de mediar circunstancias atenuantes** <u>podrá reducirse hasta en un veinticinco (25) por ciento de la pena fija establecida</u>.*
> ***Cuando concurran circunstancias agravantes y atenuantes simultáneamente****, <u>el tribunal evaluará su peso y determinará si se cancelan entre sí, o si algunos atenuantes o agravantes deben tener mayor peso en el ejercicio de su discreción al sentenciar</u>.*
> ***Las circunstancias agravantes o atenuantes que la ley ya haya tenido en cuenta al tipificar el delito, al igual que las que son inherentes al mismo,*** <u>no serán consideradas en la fijación de la pena</u>.*
> ***Las circunstancias agravantes o atenuantes que consisten en la ejecución material del delito o en los medios empleados para realizarlo****, <u>sirven únicamente para agravar o atenuar la responsabilidad de quien ha tenido conocimiento de ellas en el momento de realizar o cooperar en el delito</u>.*
> ***Las circunstancias agravantes o atenuantes que se refieran al convicto en sus relaciones particulares con la víctima o en otra causa personal****, <u>sirven para agravar o atenuar la responsabilidad sólo de aquél en quien concurran</u>.*

De igual modo, el inciso (a) del Artículo 73 del Código Penal de 2012, permite al Juez aumentar la pena fija hasta un veinticinco (25) por ciento, cuando el que ha sido convicto y sentenciado por un delito grave incurre nuevamente en otro delito grave. En lo pertinente a nuestro caso, dispone:

> *(a) Habrá reincidencia cuando el que ha sido convicto y sentenciado por un delito grave incurre nuevamente en otro delito grave. En este tipo de reincidencia se podrá aumentar hasta veinticinco (25) por ciento la pena fija dispuesta por ley para el delito cometido.[125]*

A tono con lo antes expuesto, al momento de imponer la pena, la Regla 171 de Procedimiento Criminal,[126] autoriza al juzgador a escuchar prueba sobre circunstancias atenuantes o agravantes.

En lo relativo a las circunstancias **atenuantes**, la Regla 171 inciso (a)(1)(2) de Procedimiento Criminal, le permite al juez escuchar hechos relacionados con la comisión del delito como por hechos relacionados a la persona del acusado; a saber:

> *El tribunal, a propia instancia o a instancia del acusado o del fiscal, con notificación a las partes o a la parte contraria, podrá oír, en el más breve plazo posible, prueba de circunstancias atenuantes o agravantes a los fines de la imposición de la pena.*

---

[125] **Artículo 73. — Grados y pena de reincidencia**. 33 LPRA sec. 5106.
[126] 34 LPRA Ap. II, R.171.

*Se podrán considerar como circunstancias atenuantes, entre otras, las siguientes: Para la fijación de la pena, se observarán las reglas establecidas en el Artículo 74 del Código Penal del Estado Libre Asociado de Puerto Rico, según haya o no circunstancias atenuantes o agravantes.*

**(a) Se podrán considerar como circunstancias <u>atenuantes</u>, entre otras, las siguientes:**

**(1) Hechos relacionados con la comisión del delito incluyendo, entre otros:**

**(A) El acusado fue un participante pasivo durante la comisión del delito.**[127]

*(B) La víctima provocó el incidente.*

*(C) El delito fue cometido bajo circunstancias poco usuales.*

*(D) El acusado participó en la comisión del delito bajo coacción o su conducta es parcialmente excusable por alguna otra razón que no constituye una defensa de las alegadas afirmativamente.*

*(E) El acusado no sentía ninguna predisposición, sino que fue inducido por otros a participar en la comisión del delito.*

*(F) El acusado trató de evitar el daño criminal causado a la persona o a la propiedad, o la cantidad apropiada fue mínima o se le hicieron amenazas.*

*(G) El acusado creyó que tenía un derecho o una reclamación sobre la propiedad objeto del delito, o debido a otras razones equivocadas creyó que su conducta era legal.*

*(H) El acusado fue motivado por el deseo de proveer las necesidades básicas a su familia o a sí mismo.*

*(I) El resultado delict[ivo] que [fue] producido por negligencia del acusado. Reglas de Procedimiento Criminal de 1963.*

**(2) Hechos relacionados con la persona del acusado, incluyendo entre otros:**

*(A) El acusado no tiene antecedentes.*

*(B) Edad y condiciones físicas del acusado.*

*(C) El acusado adolecía de una condición mental o física que significativamente reducía su culpabilidad.*

*(D) El acusado aceptó su responsabilidad en las etapas preliminares del proceso criminal.*

*(E) El acusado no cualificaba para una sentencia suspendida.*

*(F) El acusado restituyó a la víctima por el daño causado.*

*(G) La conducta y reputación del acusado en su comunidad es satisfactoria.*[128]

En cuanto a los **agravantes**, la Regla 171 inciso (b)(1) de Procedimiento Criminal, le permite al juez escuchar hechos

---

[127] Atenuante alegado por la acusada.
[128] Regla 171(a)(1)(2) de Procedimiento Criminal. 34 LPRA Ap. II, R.171(a)(1)(2).

relacionados con la comisión del delito, con la víctima o con la persona del acusado; a saber:

> **(b) Se podrán considerar como circunstancias _agravantes_, entre otras, las siguientes:**
>
> **(1) Hechos relacionados con la comisión del delito, con la víctima o con la persona del acusado, incluyendo entre otros:**
>
> **(A) El delito fue de violencia, se causó grave daño corporal, o amenaza de causarlo y se evidenciaron hechos que revelan una gran crueldad, ningún respeto humano y un rechazo a las normas de la decencia.**[129]
>
> **(B) El acusado utilizó un arma en la comisión del delito.**[130]
>
> (C) La víctima era particularmente vulnerable ya fuese por minoridad o incapacidad mental o física.
>
> (D) El delito envolvió más de una víctima.
>
> (E) El acusado indujo a otros a participar en la comisión del delito u ocupó una posición de líder o dominante entre los demás participantes.
>
> (F) El acusado utilizó a un menor como coparticipante.
>
> (G) El acusado amenazó a los testigos, ilegalmente evitó que los testigos asistieran a las vistas o los indujo a cometer perjurio o en cualquier otro modo obstaculizó el proceso judicial.
>
> (H) El acusado es miembro de un grupo, organización o empresa criminal organizada.
>
> (I) El delito evidencia unos designios criminales planificados.
>
> (J) El acusado recibió pago por la comisión del delito.
>
> (K) El acusado mintió durante el juicio estando bajo juramento, cuando no se le ha procesado por perjurio.
>
> (L) El delito envuelve la apropiación de una gran cantidad de dinero.
>
> **(M) El acusado tiene un historial delictivo.**[131]
>
> (N) El acusado haya utilizado en la comisión de un delito un uniforme que lo identifique como un oficial de seguridad pública, sea estatal, municipal o federal, o asociado con un empleado o funcionario de una agencia, departamento o dependencia gubernamental de las antes descritas.
>
> (O) La víctima del delito es una persona de sesenta (60) años o más de edad.
>
> (P) El delito se cometió o se consumó en una institución, albergue u hogar de cuido para personas de sesenta (60) años o más de edad, según definido en el Artículo 3 de la Ley Núm. 94 del 22 de junio de 1977, según enmendada.

Nótese, que el listado de atenuantes y agravantes de la Regla 171 antes citada, es de números abiertos. Además, la referida Regla ordena que, para la fijación de la pena se observarán las normas

---

[129] Agravante alegado por el MP.
[130] Agravante alegado por el MP.
[131] Agravante alegado por el MP.

para determinar la reincidencia que establece el Artículo 74 del Código Penal de 2012, haya o no circunstancias atenuantes o agravantes.[132]

Sabido es que la Regla 48 de Procedimiento Criminal,[133] establece el deber del MP de alegar la reincidencia en la acusación, aun cuando esta condición no sea elemento constitutivo del delito.[134] No obstante, la Regla 68 de Procedimiento Criminal,[135] establece que la alegación de reincidencia no se hará saber al Jurado en forma alguna la existencia de dicha convicción o convicciones. Por lo tanto, si el acusado acepta la alegación de reincidencia, releva al MP de probar ante el Jurado la comisión de los delitos anteriores alegados en la acusación.[136]

Ahora, es importante destacar que, a **excepción** de la reincidencia, **cualquier hecho** que aumente la pena del acusado, **tiene** que ser sometido a la consideración del Jurado y probado más allá de duda razonable.[137] La razón para ello, es que la alegación de reincidencia trata sobre unos hechos que ya han sido objeto de

---

[132] **Artículo 74. — Normas para la determinación de reincidencia.** Para determinar la reincidencia se aplicarán, las siguientes normas:

(a) No se tomará en consideración un delito anterior si entre éste y el siguiente han mediado diez (10) años desde que la persona terminó de cumplir sentencia por dicho delito.

(b) Se tomará en consideración cualquier convicción bajo el Código Penal derogado o bajo ley especial que lleve clasificación de delito grave.

(c) Se tomará en consideración cualquier convicción en jurisdicción ajena a Puerto Rico por un hecho que constituya delito grave en Puerto Rico. De tener clasificación de menos grave en Puerto Rico, no se tomará en cuenta.

(d) No se tomarán en consideración los hechos cometidos antes de que la persona cumpliese dieciocho (18) años de edad, salvo los casos excluidos de la jurisdicción del Tribunal de Primera Instancia, Sala de Asuntos de Menores, conforme establece la ley y aquellos en que dicho tribunal haya renunciado a su jurisdicción. 33 LPRA sec.5107.

[133] **Regla 48. Alegación de convicción anterior**. Una acusación o denuncia no deberá contener alegación alguna de convicciones anteriores del acusado, a menos que una alegación en tal sentido fuere necesaria para imputar la comisión de un delito, o para alegar la condición de reincidente, de subsiguiente o de delincuencia habitual en relación con el acusado. 34 LPRA Ap. II, R. 48.

[134] *Pueblo v. Pagán Rojas*, et al., 187 DPR 465, 482 (2012); *Pueblo v. Montero Luciano*, 169 DPR 360 (2006).

[135] **Regla 68. Alegaciones**. [...]. Cuando la acusación imputare un delito en algún grado de reincidencia, el acusado podrá al momento de hacer alegación, o en cualquier ocasión posterior siempre que fuere antes de leerse la acusación al jurado, admitir la convicción o convicciones anteriores y, en tal caso, no se hará saber al jurado en forma alguna la existencia de dicha convicción o convicciones. 34 LPRA Ap. II, R. 68.

[136] *Pueblo v. Montero Luciano, supra*, págs. 375-373.

[137] *Pueblo v. Pagán Rojas, et al., supra*, en la pág. 490.; *Véase,* además, *Pueblo v. Santana Vélez,* 177 DPR 61 (2009).

adjudicación judicial, mientras que las circunstancias agravantes se refieren a hechos que no han sido objeto de proceso criminales, por lo que están pendientes de ser probados más allá de duda razonable.[138] Es decir, la reincidencia es un elemento que típicamente está dirigido a aumentar la sentencia.[139]

No obstante, antes de imponer una sentencia la Regla 162.1 de Procedimiento Criminal, le impone la obligación al TPI de que, **antes** de dictar sentencia en todos los delitos graves —excepto de primer grado— deberá tener ante sí un Informe Presentencia que le haya sido preparado y rendido por el Programa de Libertad a Prueba y Libertad bajo Palabra de la Administración de Corrección, después de una investigación minuciosa de los antecedentes de la familia e historial social de la persona convicta y del efecto económico, emocional y físico causado a la víctima y su familia en la comisión del delito. Ello le permite al tribunal emitir una decisión racional de la sentencia.[140]

Por último, es harto conocido que, la Regla 162 de Procedimiento Criminal define la sentencia como un pronunciamiento hecho por el tribunal en cuanto a la pena que se le impone al acusado. En ese sentido, la referida Regla le exige al tribunal sentenciador que al momento de imponer una sentencia **debe** explicar —verbal o por escrito— las razones para la imposición de la misma.[141] Ello obedece a que, cuando el TPI expone las razones que ha tenido al imponer una pena de agravantes o atenuantes, facilita la función revisora de los tribunales apelativos.[142] A su vez, es parte de la deferencia de los tribunales revisores a no intervenir

---

[138] *Pueblo v. Pagán Rojas, supra*, pág. 492.
[139] *Pueblo v. Santana Vélez, supra*, pág. 80. Véanse, *Apprendi v. New Jersey*, 530 US 466 (2000); *Jones v. United States*, 526 US 227 (1999); *Almendarez-Torres v. United States*, 523 US 224 (1998).
[140] Regla162.1 inciso (a)1, Informe Presentencia. 34 LPRA Ap. II, R. 162.1(a)1.
[141] Regla 162. Sentencia; definición; cuándo deberá dictarse. 34 LPRA Ap. II, R. 162.
[142] *Pueblo v. Santana Vélez, supra*, pág. 117.

con el ejercicio de discreción del tribunal sentenciador en la imposición de la pena.[143]

**-C-**

Referente al tema de los autores del delito, el Código Penal de 2012 en su Artículo 44 inciso (d), dispone que se consideran autores, *"los que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, que contribuyen significativamente a la consumación del hecho delictivo"*.[144] Al respecto, la Dra. Dora Nevares Muñiz nos indica que la Ley Núm. 246-2014 **enmendó** el requisito que, tanto el Código de 2004 como el de 2012, exigían que su participación hubiera sido **imprescindible** en la comisión del delito, para establecer que este tipo de coautoría requiere de un estado mental de propósito o con conocimiento, y que la contribución al delito consumado sea **significativa**, en vez de imprescindible.[145]

Es por ello que, la *mera presencia* durante la comisión de un delito es insuficiente por sí sola para establecer *coautoría* y sostener una convicción.[146] La jurisprudencia del Tribunal Supremo de P.R., ha limitado la aplicación del concepto de *coautor* a *"aquellas personas que participan consciente e intencionalmente en la comisión de un delito"*.[147] Consecuentemente, es necesario establecer *"algún grado de consejo, incitación o participación directa o indirecta en el hecho punible"*.[148]

**-D-**

En este caso aplica la derogada Ley Núm. 404–2000 conocida como la *Ley de Armas de Puerto Rico* (Ley de Armas), ya que los

---

[143] *Pueblo v. Pérez Zayas*, 116 DPR 197, 201 (1985).
[144] 33 LPRA sec. 5067 (d).
[145] Véase, Dora Nevares-Muñiz, Código Penal de Puerto Rico (Ley 142 – 2012, según enmendada por Ley 246 - 2014) – Comentado, pág. 86. Instituto para el Desarrollo del Derecho, Inc. Ed. 2015
[146] *Pueblo v. Meléndez Rodríguez,* 136 DPR 587, 621 (1994); *Pueblo v. Aponte González,* 83 DPR 511, 519 (1961).
[147] *Pueblo v. Sustache Sustache,* 176 DPR 250, 301 (2009).
[148] *Id.*

hechos imputados fueron cometidos en la vigencia de dicha ley. Sobre la portación ilegal de un arma de fuego sin licencia,[149] en lo pertinente, el Artículo 5.04 de la Ley de Armas, dispone que:

> *Toda persona que **transporte** cualquier arma de fuego o parte de ésta, **sin tener una licencia de armas**, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, **incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años**. [...].*[150]

El aludido Artículo 5.04 dispone una pena fija de 10 años a quien incurra y sea convicta por transportar un arma de fuego.[151] Entiéndase, la mera transportación de un arma de fuego o parte de ella, sin tener licencia o permiso, constituye un delito grave. La pena fija podrá ser reducida hasta un mínimo de 5 años o, aumentada hasta un máximo de 20 años, ello dependerá de las circunstancias atenuantes o agravantes aplicables al caso.[152]

Además, se considerará como circunstancia **atenuante** *"[c]uando un arma esté descargada y la persona no tenga municiones a su alcance"*. De manera contraria, se considerará circunstancia agravante *"[c]ualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa"*.[153]

El Artículo 7.03 de la Ley de Armas es un agravamiento de las penas contempladas en esta Ley. El primer párrafo, el agravamiento está dirigido hacia convicciones previas o coetáneas con las siguientes leyes:

> *Toda persona que resulte convicta de alguna de las disposiciones de esta Ley, y que dicha convicción este asociada y sea coetánea a otra convicción de cualquiera de las disposiciones de la Ley Núm. 4 de 23 de junio de 1971, según enmendada, conocida como la "Ley de Sustancias Controladas de Puerto Rico", con excepción del Artículo 4.04 de la misma, o de la Ley Núm. 33 de 13 de julio de 1978, según enmendada, conocida como la "Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico", será sancionada con el doble de la pena dispuesta en esta Ley. [...].*[154]

---

[149] 25 LPRA ant. sec. 455 *et als.*
[150] 25 LPRA ant. sec. 458c
[151] *Ídem.*
[152] *Id.*
[153] *Id.*
[154] 25 LPRA ant. sec. 460b.

El segundo párrafo, el agravamiento está relacionado al modo en que se cumplirá la pena, y a circunstancias específicas, en cuanto a convicciones previas y los daños causados que duplican la pena. A continuación establece:

> *Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en el Artículo 2.11 de esta Ley o usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará. Toda violación a esta Ley en una zona escolar o universitaria según definida en el Artículo 1.02, conllevará el doble de la pena establecida.*[155]

**-E-**

La absolución perentoria es *"la facultad que tiene un tribunal para examinar la suficiencia de la prueba de cargo y decretar, a base de dicho examen, la no culpabilidad de un acusado".*[156] En ese sentido, se establece que:

> *"La misión fundamental de la absolución perentoria va dirigida a eliminar la posibilidad de que un jurado condene a un acusado cuando la prueba es insuficiente".*[157]

Dicha facultad aplica por igual a juicios por tribunal de derecho como a juicios por Jurado. Por esa razón, la Regla 135 de Procedimiento Criminal, establece que:

> *…El tribunal a instancia propia o a instancia de un acusado decretará su absolución perentoria en uno o varios cargos de la acusación o denuncia luego de practicada la prueba de una o de ambas partes si la misma fuere insuficiente para sostener una convicción por ese cargo o cargos.*
> *De presentarse una moción de absolución perentoria, luego de practicada toda la prueba, el tribunal podrá reservarse su resolución, someter el caso al jurado y resolver la moción, bien antes del veredicto o después del veredicto o de disolverse el jurado sin rendir veredicto. Si el tribunal declarare sin lugar la moción antes de rendirse un veredicto de culpabilidad o de disolverse el jurado sin veredicto, la moción podrá reproducirse dentro del término jurisdiccional de los cinco días de rendido el veredicto o disuelto el jurado, siempre que no se hubiere dictado sentencia.*[158]

---

[155] *Ídem.*
[156] *Pueblo v. Colón Castillo*, 140 DPR 564, 576 (1996).
[157] *Id.*
[158] Regla 135 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 135.

La referida Regla 135 de Procedimiento Criminal, viabiliza tal facultad judicial, pues, permite al tribunal que, *motu proprio* o a solicitud de parte, impida la continuación del caso o, incluso, revoque el veredicto del Jurado cuando la prueba presentada resulta insuficiente para sostener una convicción.[159]

> *[E]sta suficiencia de la prueba es la que le compete al tribunal evaluar ante una moción de absolución perentoria. La prueba suficiente será aquella que permite en derecho hallar a un ciudadano culpable más allá de duda razonable, por lo cual se requiere que el Pueblo establezca todos los elementos del delito y la conexión del acusado con éstos. Es decir, tiene que tratarse de prueba que, como mínimo, exponga todos los elementos del delito y sea susceptible de ser creída por una persona razonable. [...] Es, pues, un análisis estrictamente en derecho, que aunque recae sobre la evidencia, sólo busca asegurar que, de cualquier manera en que se interprete la veracidad, los requisitos legales estarán presentes para poder permitir cualquiera de los veredictos posibles. (citas omitidas).[160]*

Así, la absolución perentoria persigue evitar que un ciudadano sea convicto sin el rigor que nuestro ordenamiento exige, una vez el tribunal se convence de que la prueba no puede rebasar las dudas que necesariamente habría de tener una persona razonable sobre la culpabilidad del acusado.[161]

Por otra parte, finalizada la presentación de la prueba y los informes de ambas partes, la Regla 137 de Procedimiento Criminal, establece lo relacionado a las instrucciones al Jurado; a saber:

> *Terminados los informes, el tribunal deberá instruir al jurado haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias para la información del jurado. Por estipulación de las partes, hecha inmediatamente antes de empezar las instrucciones y aprobada por el tribunal, se podrá omitir hacer el resumen de la evidencia. Todas las instrucciones serán verbales a menos que las partes consintieren otra cosa. Cualquiera de las partes podrá presentar al tribunal una petición escrita de que se den determinadas instrucciones, al terminar el desfile de la prueba, o anteriormente si el tribunal razonablemente así lo ordena. Deberá servirse copia de dicha petición a la parte contraria. El tribunal podrá aceptar o rechazar cualquiera o todas dichas peticiones, anotando debidamente su decisión en cada una, e informará a las partes de su decisión antes de que estas informen al jurado. Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a*

---

[159] *Pueblo v. Colón, Castillo, supra,* en la pág. 578; *Pueblo v. Rivera Ortiz,* 150 DPR 457, 462 (2000).
[160] *Pueblo v. Rivera Ortiz, supra,* en las págs. 462 – 463.
[161] *Pueblo v. León Cortijo,* 146 DPR 394, 397 (1998).

*ellas o solicitare instrucciones adicionales antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud. Se le proveerá oportunidad para formular estas fuera de la presencia del jurado. El tribunal procederá entonces a resolver la cuestión, haciendo constar su resolución en el expediente o trasmitiendo cualquier instrucción adicional que estimare pertinente. Al terminar las instrucciones el tribunal nombrará al presidente del jurado y ordenará que el jurado se retire a deliberar. En sus deliberaciones y veredicto el jurado vendrá obligado a aceptar y aplicar la ley según la exponga el tribunal en sus instrucciones.[162]*

Como vemos en la citada Regla, en un juicio por jurado el tribunal debe impartir instrucciones haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias para la información del jurado. En ese sentido, las instrucciones deben ser correctas, claras, precisas y lógicas.[163] El Tribunal Supremo de Puerto Rico, ha expresado que la utilización del libro de instrucciones es discrecional.[164] No obstante, ha reconocido que constituye una buena práctica su utilización en aras de disminuir las posibilidades de error en las instrucciones al jurado y de lograr mayor uniformidad en la administración de la justicia criminal.[165] Cabe destacar que —las instrucciones que son impartidas según el manual— están cobijadas por una presunción de corrección.[166] Por lo tanto, quien las impugne deberá demostrar afirmativamente que la instrucción es errónea.[167] Es decir, a la hora de —determinar la corrección o incorrección de las instrucciones— hay que considerarlas en su totalidad y no por frases aisladas.[168]

**-F-**

En lo que respecta al recurso de apelación criminal, se ha expresado que la determinación que hizo el juzgador de los hechos

---

[162] Regla 137 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 137.

[163] *Pueblo v. Ortiz Martínez,* 116 DPR 139 (1984) citado en *Pueblo v. Colón González,* 209 DPR 967, 987 (2022).

[164] *Pueblo v. Colón González, supra.*

[165] *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299, 343 (1991), citado en *Pueblo v. Colón González, supra.*

[166] *Pueblo v. Ortiz González,* 111 DPR 408, 410 (1981), citado en *Pueblo v. Colón González,* 2022 TSPR 83, *supra.*

[167] *Ídem.*

[168] *Pueblo v. Echevarría Rodríguez I, supra,* pág. 344, citado en *Pueblo v. Colón González,* 2022 TSPR 83, *supra.*

de la culpabilidad del acusado más allá de duda razonable es revisable en apelación por tratarse de un asunto tanto de hecho como de derecho.[169] No obstante, dado que le corresponde al jurado o, en su defecto, al juez dirimir los conflictos de prueba, no es aconsejable intervenir en tales determinaciones, *en ausencia de pasión, prejuicio, parcialidad o error manifiesto.*[170] Por lo tanto, la determinación de culpabilidad que hace el juzgador de los hechos a nivel de instancia, ya sea en un juicio por jurado o por tribunal de derecho, es merecedora de una **gran deferencia por parte del tribunal apelativo**.[171]

Esa presunción de corrección que acompañan las actuaciones de los tribunales de instancia, *le compete al apelante la obligación de demostrar lo contrario.*[172] Para ello, es necesario señalar el error y fundamentarlo en cuanto a los hechos y la fuente del derecho que la sustentan; de esa forma, podrá el foro apelativo estar en posición de atender los reclamos que allí se plantean. *De ahí, la importancia de la reproducción de la prueba oral, ya que sin ella, los foros apelativos están impedidos de descartar la apreciación de la prueba que realizó el tribunal de instancia.*[173]

Por otra parte, el que el auto de *certiorari* es un vehículo procesal de carácter discrecional que permite a un tribunal de mayor rango revisar las determinaciones de un tribunal inferior.[174]

El carácter discrecional estriba en tener el poder para decidir en una forma u otra; es decir, escoger entre uno o varios cursos de acción.[175]

---

[169] *Pueblo v. Rodríguez Pagan,* 182 D.P.R. 239, 259 (2011).
[170] *Id.* Énfasis nuestro.
[171] *Id.* Énfasis nuestro.
[172] *Pueblo v. Prieto Maysonet,* 103 D.P.R. 102, 107 (1974). Énfasis nuestro.
[173] *Pueblo v. Calderón Hernández,* 145 D.P.R. 603, 605-606 (1998).
[174] *Mun. de Caguas v. JRO Construction,* 201 DPR 703, 711 (2019); *IG Builders et al. v. BBVAPR,* 185 DPR 307, 337 – 338 (2012).
[175] *García v. Asociación,* 165 DPR 311, 321 (2005).

Bajo esa facultad discrecional, la Regla 40 del Reglamento del Tribunal de Apelaciones, dispone los siguientes criterios:

*El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de certiorari o de una orden de mostrar causa:*

*(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.*

*(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.*

*(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.*

*(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.*

*(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.*

*(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.*

*(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.* [176]

Ahora, el Tribunal Supremo de Puerto Rico ha dispuesto que:

*[D]e ordinario, no se intervendrá con el ejercicio de discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial.* [177]

**-III-**

A la luz de la normativa antes expuesta, procedemos a evaluar los errores señalados en los recursos *KLAN202200547* y *KLCE202200816* ante nuestra consideración.

### A. *KLAN202200547*

En cuanto al recurso de apelación KLAN202200547, la señora Piñero Herrera nos señala cinco (5) errores. En primer orden,

---

[176] Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R.40.
[177] *Zorniak Air Services v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992); *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).

discutiremos en conjunto los errores uno (1), dos (2), cuatro (4) y cinco (5). En segundo orden, atenderemos el error número tres (3).

**a.**

En resumen, los errores uno (1) y dos (2), la acusada aduce que la prueba de cargo ante el Jurado fue insuficiente y contradictoria para probar más allá de duda razonable, la coautoría en el delito de robo agravado y portación ilegal de ley de arma de fuego. En ese sentido, nos indica —en los errores cuatro (4) y cinco (5)— que el TPI erró al declarar *No ha lugar* la moción de absolución perentoria en dichos delitos de robo agravado y portación ilegal de ley de arma de fuego. No tiene razón.

Cónsono con el derecho esbozado, la prueba tiene que demostrar los elementos de los delitos imputados más allá de duda razonable, así como la conexión de la persona acusada con la comisión de los hechos delictivos.

Primeramente, el testimonio de la empleada Eneida Santana Quiñones identifica claramente a la señora Zulis Piñero Herrera como coautora del robo a mano armada. En particular, el domingo, 14 de junio de 2019, alrededor de las 8:45 p.m., la empleada Santana Quiñones limpiaba los cristales que daban al estacionamiento del restaurant KFC y observa a la acusada llegar en un auto —blanco con aros grandes y plateados— que conducía el coautor. El vehículo se detiene frente a la entrada, la acusada se baja, entra al establecimiento —que tiene buena iluminación— y es observada en todo momento por la empleada en espera de poder ayudarla, ya que en ese momento el restaurant se encontraba **sin clientes**. Sin embargo, la acusada cruza mirada con la empleada Santana Quiñones y luego observa a su alrededor como *"a ver si hay más gente"*. Acto seguido, se dirige al baño.

Ya en el tocador de damas, la empleada Santana Quiñones escucha que la acusada "flochea" el toilet y luego oye el sonido del

agua del lavamanos. Al poco tiempo, la acusada Piñero Herrera sale del baño, mientras que la empleada la sigue mirando por si le pedía alguna cosa; cruzan miradas, pero la apelante camina hacia la salida y llega al estacionamiento (que estaba alumbrado) en donde mismo se encontraba el vehículo blanco con el coautor al volante. La empleada Santana Quiñones se mueve hacia el área de la puerta del restaurant, se sube a una mesa para continuar limpiando los cristales, y desde allí, observa claramente a la pareja que se encontraban hablando dentro del vehículo color blanco. El estacionamiento está bien alumbrado, ya que las luces de la cervecería India —que colinda con la tienda— aumenta la iluminación.

Al poco tiempo, la empleada Santana Quiñones se percata que el conductor se baja del automóvil, da unos pasos y —en las escaleras antes de entrar a la tienda— se dobla para colocarse una máscara negra que le cubre el rostro. Acto seguido, abre la puerta del restaurant y le dice a Santana Quiñones: "*No me mires porque te mato*". Inmediatamente, el asaltante le apunta con un arma de fuego, color plata con franja negra. La empleada Santana Quiñones se baja nerviosa de la mesa, y el asaltante, apuntándole con el arma de fuego, le pide: *"Dame el dinero",* y ella contesta: *"Yo no tengo ningún dinero".* El asaltante insiste: *"Dame el dinero";* ella responde: *"No tengo ningún dinero".* Entonces pregunta*: "¿Quién tiene el dinero?";* a lo que ella contesta: *"La gerente". "Pues, vamos para la gerente",* responde el asaltante. Ambos se dirigen a la gerente de turno, señora Catherine Quilit Lugo que, en ese momento, se encontraba encerrada en la oficina extrayéndose leche materna. El asaltante, a punta de pistola saca a la gerente de la oficina, amenaza a los empleados, y eventualmente, logra el robo y huye del restaurant con $532.38.

La empleada Santana Quiñones fue entrevistada por los agentes, Jesús Morales Caro (primero en llegar a la escena) y Mártir Arcelay (agente investigador de este caso). Además de describir al asaltante, la señora Santana describió a la coautora como una dama trigueña con ojos hundidos, ojeras, peinaba unas trenzas y vestía un conjunto ("set") de color violeta, pantalón corto y blusa con diseño de flores. Desde que fue interrogada se sostuvo que podía identificar al asaltante y la coautora. Razón por la cual, al tercer día del robo, el Agte. Carlos Albertos Luego Ayala, (CIC ROBO) testificó que —en el *line up* de fotos mostrado por el Agte. Mártir Arcelay— la señora Santana Quiñones identificó de inmediato y sin duda alguna, a la acusada Zulis Piñero Herrera como la núm. 3, de nueve (9) fotos de sospechosas. También, identificó al coautor Christian Jordán Placeres. Además, la Policía corroboró la falta de licencia de portación de arma de fuego.

Junto al testimonio de la señora Santana Quiñones y los testigos de cargo, el MP le presentó al Jurado fotografías y el video del restaurante KFC y sus alrededores que **corroboraron la presencia** de la acusada en la misma noche y lugar del robo.

A tono con la prueba presentada por el MP, coincidimos con los veredictos unánimes de culpabilidad —más allá de duda razonable— que hizo el Jurado en los delitos de robo agravado y portación ilegal de arma de fuego. Surge de la prueba presentada y creída por el Jurado que la acusada Piñero Herrera participó como coautora del robo a KFC. Es decir, el Jurado razonablemente infirió que la participación de la acusada antes del robo agravado consistió en examinar el interior del restaurant y notificarle al coautor de lo observado. La prueba demostró una participación significativa que configuró su coautoría y los elementos del delito de robo agravado y portación ilegal de arma de fuego.

Por otra parte —y a tono con dicha prueba— tampoco cabe hablar de absolución perentoria. Un análisis estrictamente en derecho sobre la evidencia presentada por el MP y creída por el Jurado, resultan suficientes para sostener los veredictos de culpabilidad por los delitos de robo agravado y portación ilegal de arma de fuego. No estamos ante la ausencia de uno o varios de los elementos del delito ni mucho menos de insuficiencia de la prueba presentada.

Ante la falta de prejuicio, parcialidad, error manifiesto o fraude le debemos dar deferencia a los veredictos de culpabilidad emitidos en este caso por el Jurado. En ese sentido, tampoco erró el TPI al denegar la solicitud de absolución perentoria.

**b.**

En segundo orden, la acusada arguye en el error núm. 3 que el TPI incidió al impartir al Jurado la instrucción de coautoría, y no, de mera presencia incidental de la apelante. No tiene razón.

Conforme a los hechos reseñados, el TPI impartió al Jurado —entre otras— la instrucción de coautoría, a tono con la Instrucción 4.11 del *Libro de Instrucciones al Jurado.*[178] En ese sentido, las instrucciones que son impartidas, según el manual, están cobijadas por una presunción de corrección.

En su alegato suplementario, la apelante insiste en que la prueba presentada por el MP justificaba una instrucción especial al

---

[178] Véase, Instrucción 4.11 del *Libro de Instrucciones al Jurado* (Actualizado en Febrero de 2022), a la pág. 83, reza como sigue:

*En este juicio se están juzgando a **[indique la cantidad]** acusados(as). Si a ustedes se les demuestra, más allá de duda razonable, que todos los (las) acusados(as) se unieron para realizar o ejecutar el acto que se les imputa y que contribuyeron significativamente a la comisión del delito, ante la ley son coautores(as) y responsables del mismo delito, aunque una sola persona haya producido el resultado. Si, por el contrario, no se demuestra la unión de voluntades de todas las personas acusadas en la realización del acto, entonces la responsabilidad habrá de recaer sobre quienes actuaron conjuntamente o sobre quien lo realizó por sí solo(a).*

*Cuando se trata de dos o más personas acusadas, el Jurado no está obligado a rendir el mismo veredicto para cada una de ellas. Ustedes deben resolver, de acuerdo con la apreciación de la prueba, en cuanto a cada acusado(a) en particular y, a base de ello, deberán determinar su culpabilidad o no culpabilidad por separado.*

Jurado de mera presencia incidental. En síntesis, arguye que, basado en el testimonio de la empleada Santana Quiñones, su presencia fue una incidental, pues se limitó a entrar al restaurant KFC, usar el baño de damas y salir del establecimiento.

Dicha argumentación carece de méritos. Como vimos, la prueba presentada y creída por el Jurado demostró que la apelante llegó al estacionamiento de KFC en un automóvil blanco con aros grandes y plateados en compañía de un varón que conducía el mismo. Desde ese momento, la empleada Santana Quiñones la observa cuando se baja del vehículo por el lado del pasajero, entra a KFC y cruzan miradas; y luego, mira como *"a ver si hay más gente"*. Sigue hacia el baño, y estando allí, se escucha el sonido del del toilet y lavamanos. Sale del baño, no pide nada y deja el establecimiento que —en ese momento— no tenía clientes. Al llegar al auto, la empleada observa que la apelante se monta por el lado del pasajero y allí conversa con el conductor. Los puede ver conversando, ya que el estacionamiento de KFC tiene buen alumbrado, gracias a las luces de la cervecería India que colinda con dicho restaurant. Es entonces que se percata de que el conductor del vehículo se baja, camina hasta las escaleras que están a la entrada, se detiene y se cubre el rostro con una máscara. Entra al restaurant y amenaza de muerte a la señora Santana para que no lo mire; acto seguido, saca el arma de fuego y comienza el robo a mano armada hasta escapar con el dinero hurtado.

A tono con lo antes dicho, no vemos que la prueba presentada justificara una instrucción especial de mera presencia incidental. Todavía más, al examinar la TPO provista por la apelante, notamos que omitió reproducir las instrucciones que el Juez impartió al Jurado. Es decir, solo sabemos que —entre otras instrucciones— se impartió al Jurado la instrucción de coautoría; sin embargo, un

examen del expediente no surge que el Juez haya errado al no impartir la instrucción especial solicitada por la acusada.

Por lo que, a la hora de determinar la corrección o incorrección de las instrucciones, hay que considerarlas en su totalidad y no por frases aisladas. El tercer error no se cometió.

### B. KLCE202200816

En resumen, el Procurador General alega que el TPI erró al aplicar una sentencia atenuada y omitir considerar la reincidencia simple en el presente caso, pese a que la misma fue aceptada por la acusada. Tiene razón.

En primer orden, en este caso las acusaciones iniciales contenían alegación de reincidencia y fueron aceptadas por la acusada; así, dicha alegación fue eliminada de los pliegos acusatorios y no se presentó al Jurado por acuerdo entre las partes. En consecuencia, una vez aceptada la reincidencia por la acusada, **relevó al MP de probar ante el Jurado la comisión de los delitos anteriores alegados en la acusación**.[179] Además, cabe destacar que el Informe Presentencia, reveló que: **(1)** al momento de cometer los delitos,[180] la acusada disfrutaba de los beneficios de una sentencia suspendida de seis (6) años por encubrimiento cuando era Oficial de Custodia del DCR;[181] **(2)** el historial delictivo de la convicta que no se consideró para imputar reincidencia, ya que le fue revocada la sentencia suspendida;[182] y, **(3)** la acusada no aceptó su

---

[179] Artículo 73 inciso (a) del Código Penal. Habrá reincidencia cuando el que ha sido convicto y sentenciado por un delito grave incurre nuevamente en otro delito grave. En este tipo de reincidencia se podrá aumentar hasta veinticinco (25) por ciento la pena fija dispuesta por ley para el delito cometido. 33 LPRA sec. 5106.
[180] Robo agravado y portación ilegal de arma de fuego.
[181] Artículo 66 inciso (b) del Código Penal.
   El convicto cometió el delito mientras disfrutaba de los beneficios de sentencia suspendida, libertad bajo palabra, restricción domiciliaria o libertad provisional bajo fianza o condicionada, o en un programa de desvío. 33 LPRA sec. 5099.
[182] Artículo 66 inciso (a) del Código Penal.
   El convicto tiene historial delictivo que no se consideró para imputar reincidencia. 33 LPRA sec. 5099.

responsabilidad como coautora y le atribuyó toda la responsabilidad al coautor.

En segundo orden, —y como indicamos— a **excepción** de la reincidencia, **cualquier hecho** que aumente las penas del acusado, **tiene** que ser sometido a la consideración del Jurado y probado más allá de duda razonable. Eso no ocurrió, por lo que el MP estaba impedido de solicitar al TPI agravantes en la pena por los hechos en la comisión de los delitos en este caso.

En tercer orden, la acusada aduce a su favor que —a pesar de la reincidencia— el TPI tiene discreción para no aumentar la pena; es decir, a la reincidencia le aplicó un aumento de 0% a la pena. Además, señala que, el TPI tomó como atenuante el hecho de que su participación en el robo agravado no fue por sí sola determinante para ocasionar el daño o peligro que ocasionó,[183] por lo que atenuó en un 25% el delito de robo agravado para una pena atenuada de 19 años y 9 meses de cárcel.

Resulta cierto que TPI tiene discreción para aumentar o reducir la pena hasta un 25% cuando hay circunstancias agravantes o atenuantes que lo permitan; o cancelarse entre sí, cuando concurren igual número de circunstancias agravantes y atenuantes. Más claro, a tono con el citado Artículo 67 del Código Penal, el Juez —**tiene amplia discreción**— para evaluar y determinar cuáles de los agravantes o atenuantes tienen mayor o menor peso, o, si los mismos se cancelan entre sí. Para ello, el Juez **debe explicar** —verbal o por escrito— las razones para la imposición de la sentencia.[184] Es por esta razón que, para emitir una **decisión racional** sobre dicha sentencia, el Juez sentenciador **deberá** contar con un Informe Presentencia, **antes** de dictar la misma.[185]

---

[183] Artículo 65 inciso (l) del Código Penal. 33 LPRA sec. 5099.
[184] Regla 162. Sentencia; definición; cuándo deberá dictarse. 34 LPRA Ap. II, R. 162.
[185] Regla162.1 inciso (a)1, Informe Presentencia. 34 LPRA Ap. II, R. 162.1(a)1.

A manera de ejemplo, una vez el Juez pondera las circunstancias agravantes y atenuantes que concurran entre sí, podría imponer un aumento o reducción de la pena de un 0% si entiende que se neutralizan. También, podría aumentar la pena hasta un máximo de 25% si estima un mayor peso de los agravantes, o, podría imponer una reducción máxima hasta 25% en caso de atenuantes. Lo **importante** es que el Juez **explique** —verbal o escrito— porqué tomó una u otra decisión.

Ahora bien, **lo que no puede ocurrir es que** —una vez **probado** el agravante o atenuante— el Juez imponga **sobre un 25%** de aumento o reducción de la pena. Tal actuación es irrazonable que resulta en un **abuso de discreción** contrario a la ley.

En cuanto al **robo agravado** —en modalidad de uso de arma de fuego— quedó probado más allá de duda razonable, por lo que correspondía imponer una **pena fija de 25 años de cárcel**.

Ahora, en cuanto a la agravación pena, resulta innegable que la acusada aceptó la alegación de reincidencia simple.[186] Además, consta en el Informe Presentencia que la acusada disfrutaba de los beneficios de una sentencia suspendida de seis (6) años,[187] cuando cometió el delito de robo agravado,[188] por lo cual, al ser revocada dicha sentencia suspendida, cuenta con un historial delictivo que no se consideró para imputar reincidencia.[189] Tampoco asumió su responsabilidad como coautora y le atribuyó toda culpa al coautor.

Por otra parte, en cuanto a la atenuación de la pena la acusada adujo que su participación no fue por sí sola determinante para ocasionar el daño o peligro que provocó el hecho.[190]

---

[186] Artículo 73 inciso (a) del Código Penal. 33 LPRA sec. 5106.
[187] Por una convicción de encubrimiento cuando fungía como Oficial Correccional del DRC.
[188] Artículo 66 inciso (b) del Código Penal. 33 LPRA sec. 5099.
[189] Artículo 66 inciso (a) del Código Penal. *supra.*
[190] Artículo 65 inciso (l) del Código Penal. 33 LPRA sec. 5098.

Por lo tanto, al momento de sopesar la concurrencia de las circunstancias agravantes y la circunstancia atenuante, el TPI —**sin explicación alguna**— no le otorgó ningún valor la reincidencia simple y los tres (3) agravantes que el MP presentó.[191] Sin embargo, al evaluar el atenuante le aplicó una <u>reducción máxima de 25%</u>. Es decir, le dio el valor máximo de 25% de reducción a la circunstancia atenuante, y un valor de 0% a todos los agravantes. Como resultado, procedió a dictar una <u>sentencia atenuada de 19 años y 9 meses de cárcel</u> por el delito de robo agravado.

En virtud de lo antes dicho, el Juez sentenciador abusó de su discreción al fijar una **sentencia atenuada** por el delito de robo agravado. Bien conocemos la amplia discreción que goza el TPI a la hora de dictar sentencia. No obstante, la misma no debe ser arbitraria o irracional.

Surge del expediente que, además de la reincidencia simple, hay dos (2) agravantes relacionados a dicha reincidencia que obran en los incisos (a) y (b) del Artículo 66 del Código Penal,[192] además, hay un tercer agravante sobre la falta de carácter de la convicta al no aceptar su responsabilidad y atribuírsela al coautor. Estos agravantes superan numéricamente la única circunstancia atenuante que consta en el inciso (l) del Artículo 65 del Código Penal, relativo a que la participación de la convicta no fue por sí sola determinante para ocasionar el daño o peligro provocado.[193]

---

[191] El TPI descartó los agravantes del Artículo 66 incisos (a) y (b) del Código Penal. Además, el agravante que obra en el Informe Presentencia, relativo a que la convicta no asumió su responsabilidad como coautora y le atribuyó toda culpa al coautor.

[192] Artículo 66 inciso (a) y (b) del Código Penal.

(a) El convicto tiene historial delictivo que no se consideró para imputar reincidencia.

(b) El convicto cometió el delito mientras disfrutaba de los beneficios de sentencia suspendida, libertad bajo palabra, restricción domiciliaria o libertad provisional bajo fianza o condicionada, o en un programa de desvío. 33 LPRA sec. 5099.

[193] Artículo 65 inciso (l) del Código Penal. 33 LPRA sec. 5098.

Estamos conscientes de que el Juez sentenciador —en su discreción— intentó dictar sentencias que favorecieran a la convicta. Ahora bien, ello debió ser dentro de un marco racional. En ese sentido, —y siguiendo la intención del TPI— al sopesar y valorizar la concurrencia de todos los agravantes con la única circunstancia atenuante, podemos concluir que se neutralización entre sí, por lo tanto, corresponde un 0% de aumento y de reducción de la pena fija.

Por esa razón, debemos revocar la sentencia atenuada antes dictada, y se ordena al Juez sentenciador a celebrar una vista para dictar una sentencia con la pena fija de 25 años por robo agravado.

Pasemos ahora a examinar la pena fijada en el Artículo 5.04 de la Ley de Armas. Allí, el TPI también le impuso a la señora Piñero Herrera una **sentencia <u>atenuada</u> de 5 años** de cárcel, a ser cumplida de forma consecutiva con el cargo de robo agravado.

No obstante, el citado Artículo 5.04 establece **un término <u>fijo</u> de diez (10) años**, para toda persona convicta por portar un arma de fuego sin licencia. Por dicho delito fue convicta la acusada.[194]

Ahora bien, este Artículo establece las circunstancias agravantes o atenuantes, que podrá alterar la pena fija **de diez (10) años**, de la siguiente forma:

> De mediar circunstancias agravantes, la pena fija establecida ***<u>podrá ser aumentada hasta un máximo de veinte (20) años</u>***; de mediar circunstancias atenuantes, ***<u>podrá ser reducida hasta un mínimo de cinco (5) años</u>***.[195]

También, expresamente detalla una sola circunstancia **atenuante** que el referido Artículo 5.04 establece bajo la siguiente circunstancia:

> *Se considerará como **"atenuante"** cuando <u>el arma esté descargada y la persona no tenga municiones a su alcance</u>.[196]*

De igual, modo, expresa solo una circunstancia **agravada** que dicho Artículo 5.04 establece como sigue:

---

[194] 25 LPRA ant. sec. 458c.
[195] *Idem.*
[196] *Id.*

> *Se considerará como **"agravante"** <u>cualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa.</u>*[197]

A tono con lo antes dicho, en este caso no cabe hablar de la circunstancia **atenuante** antes señalada, ni de la circunstancia **agravante**, —*de que el arma de fuego se utilizó para la comisión del delito de robo agravado*— **ya que dicho agravante no le fue presentado al Jurado**. Tampoco cabe hablar de duplicar la pena bajo ninguna de las circunstancias del Artículo 7.03 de la Ley de Armas.[198]

El Procurador General arguye que el Juez sentenciador erró **descartar sin explicación alguna** los siguientes agravantes: **(1)** la aplicación de la reincidencia simple, **(2)** que la convicta tiene historial delictivo que no se consideró para imputar reincidencia, y **(3)** que cometió los delitos mientras disfrutaba de los beneficios de sentencia suspendida.

En su oposición, la acusada arguye que el TPI correctamente descartó el citado Artículo 7.03 y aplicó el atenuante que entendió probado, y ejerció su discreción al fijar una sentencia atenuada de cinco (5) años de cárcel.

Bajo el mismo razonamiento antes dicho, el TPI abusó de su discreción al dictar una sentencia atenuada de cinco (5) años de cárcel. Nótese, que, **sin explicación alguna**, **le aplicó** un <u>**0%**</u> de valor a la reincidencia simple que la acusada había aceptado. De igual forma, le otorgó un <u>**0%**</u> de valor a los agravantes relativos a que la convicta tiene historial delictivo que no se consideró para imputar reincidencia y que disfrutaba de los beneficios de una sentencia suspendida cuando cometió este delito. Ello, en contraste con el valor máximo de 5 años de reducción del único atenuante

---

[197] *Id.*
[198] 25 LPRA ant. sec. 460b.

relativo a que la participación de la convicta no fue por sí sola determinante para ocasionar el daño o peligro provocado.[199]

Lo racional es que encontramos una neutralización al sopesar y valorizar todos los agravantes antes indicados y de la circunstancia atenuante. Por lo tanto, resulta en un **0%** de aumento y reducción de la pena fija de diez (10) años por el delito de portación ilegal de un arma de fuego.

En consecuencia, debemos **revocar la sentencia atenuada** y ordenar al Juez sentenciador a celebrar una vista para dictar sentencia con **pena fija de diez (10) años** de cárcel por el delito del Artículo 5.04 de la Ley de Armas, consecutiva con la pena del robo agravado.

A tono con lo antes expresado, se expide el auto de *certiorari* y se revocan las sentencias atenuadas por los delitos de robo agravado y portación ilegal de arma de fuego. Por lo que ordenamos la celebración de una vista para dictar sentencias fijas en ambas penas; así, modificadas se confirman las sentencias apeladas.

### -IV-

Por los fundamentos antes expresados, se expide el auto de *certiorari* solicitado y se revocan las sentencias atenuadas en los cargos de robo agravado y portación ilegal de un arma de fuego. Se ordena al TPI a celebrar una vista para dictar sentencias fijas en ambas penas; y así, modificadas, se confirman las Sentencias apeladas que fueron probadas más allá de duda razonable en dos veredictos unánimes emitidos por un Jurado.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[199] Artículo 65 inciso (l) del Código Penal. 33 LPRA sec. 5098.